JOHN QUINN vs. MAR-LEES SEAFOOD, LLC[1]; NORTHERN
HARVEST, INC., third-party defendant.

No. 06-P-588.

Middlesex. January 11, 2007. - August 7, 2007.

Present: LENK, COWIN, & GRAHAM, JJ.

*Contract*, Performance and breach, Specific performance. *Practice, Civil,*
Judgment notwithstanding verdict, Instructions to jury.

The judge in a civil action arising from a dispute regarding a contract to pay
    royalties to the plaintiff properly instructed the jury regarding what sales
    the parties intended to be covered [693-698]; likewise, there was no error
    in the judge's instructions regarding the defendant's affirmative defenses
    and counterclaims [698-702].
In a civil action alleging that the defendant, the plaintiff's former employer,
    had committed a breach of a written agreement to pay the plaintiff royal-
    ties based on profits derived from certain of the defendant's sales, the
    jury's verdict in favor of the plaintiff was supported by the evidence, and
    the judge acted within his discretion in denying the defendant's motion for
    a new trial, given that the jury permissibly found that the parties never
    entered into an oral agreement superseding their written agreement and
    amendment (the operative provisions of which required the payment of
    royalties to the plaintiff) [702-703]; further, there was no merit to the
    defendant's argument that the damages awarded were excessive [703-704].
A Superior Court judge's denial of specific performance of the royalties provi-
    sion in a certain business agreement was justified on grounds other than
    those stated by the judge, namely, that the rights of the parties were clearly
    established by agreement, and a judgment of specific performance would
    add nothing, as the plaintiff had an adequate remedy at law if a breach
    were to occur in the future. [704-707]

CIVIL ACTION commenced in the Superior Court Department on
April 10, 2001.

The case was tried before *Ralph D. Gants*, J., and motions
for judgment notwithstanding the verdict and for specific per-
formance were heard by him.

[1]At the time of the events in question, the defendant was named "Mar-Lees
Seafood, Inc." The defendant was renamed "Mar-Lees Seafood, LLC," prior
to trial, and the complaint was amended accordingly.

*Robert M. Duffy* for the defendant.

*Lawrence G. Green* (*Susan E. Stenger* with him) for the plaintiff.

COWIN, J. The plaintiff, John Quinn, obtained a favorable jury verdict on his complaint in the Superior Court that the defendant, Mar-Lees Seafood, LLC (Mar-Lees), had committed a breach of a written agreement to pay him royalties based on profits derived from certain of the defendant's sales. The jury awarded the plaintiff damages in the amount of $389,310.56, and rejected Mar-Lees's counterclaims for breach of an alleged oral agreement and breach of fiduciary duty. The jury rejected as well Mar-Lees's claim against the third-party defendant, Northern Harvest, Inc. (Northern Harvest), of which the plaintiff was a principal shareholder, for breach of an alleged obligation to transfer its trade name to the defendant. Final judgment, subsequently amended, entered in accordance with the jury verdicts. The judge denied the plaintiff's posttrial motion for specific performance of the royalty agreement in the future, and denied as well Mar-Lees's motion for judgment notwithstanding the verdict or for a new trial, thereby precipitating these cross appeals. We affirm the amended judgment in favor of the plaintiff for damages to the time of trial and against Mar-Lees on its counterclaim and third-party complaint, and the order denying Mar-Lees's motion for judgment notwithstanding the verdict or for new trial. We affirm as well the order denying specific performance of the agreement in the future, but for a reason other than that advanced by the judge.

1. *Background.* The plaintiff having obtained a verdict in his favor, we recite the facts in the light most favorable to him. See *Situation Mgmt. Sys., Inc.* v. *Malouf, Inc.*, 430 Mass. 875, 876 (2000). The plaintiff and a business partner, Joseph O'Donnell, were at all material times the shareholders of Northern Harvest, a company that manufactured and sold packaged fish. In late 1999, the plaintiff and representatives of Mar-Lees, a scallop distributor, entered into discussions regarding a possible merger of the two companies. By December, 1999, there had been sufficient movement to that end that the parties decided to take immediate, albeit preliminary, steps to make the companies "one." Mar-Lees assumed control of the operational and administrative

affairs of Northern Harvest; agreed to expedite the purchase of equipment necessary to make use of a "modified atmospheric packaging" technology for the preservation of fish that was then the property of Northern Harvest; and employed the plaintiff, on a salaried basis, as Mar-Lees's nominal president, effective January 1, 2000. The plaintiff was charged both with persuading Northern Harvest's current customers to do business with Mar-Lees, and with developing new customers for what was expected to become the reorganized enterprise. The parties also agreed to continue their work toward memorializing the integration of the two companies. This resulted in the acquisition by Mar-Lees of business (and related sales) that would otherwise have been enjoyed by Northern Harvest.

In the course of discharging his new responsibilities, the plaintiff brought together Phillip Walsh, manager of seafood sales of Stop & Shop Supermarkets, Inc. (Stop & Shop), and Jack Morris, vice-president for procurement and sales of Mar-Lees. Following subsequent meetings between Walsh and Morris, an agreement was reached that, effective in March, 2000, Stop & Shop would offer Mar-Lees's fresh sea scallops in its stores on an exclusive basis.

On April 5, 2000, Northern Harvest and Mar-Lees, as well as the plaintiff, O'Donnell, and John Lees[2] individually, signed a letter of intent (agreement) setting forth the possible terms of an asset acquisition by Mar-Lees. With the exception of certain provisions applicable to the plaintiff individually (see *infra*), which provisions were intended to take effect immediately, the terms of the agreement were not binding, and the parties contemplated the subsequent preparation and execution of "a definitive written acquisition agreement."

By means of the agreement, the parties decided provisionally that Mar-Lees would acquire, for a nominal sum, certain assets presently owned by Northern Harvest. Assets to be transferred included so-called "modified atmospheric packaging" technology for the preservation of fish that was then controlled by Northern Harvest; Northern Harvest's customer list; and the good will of Northern Harvest as a going concern. At the same

---

[2]John Lees was, at the time, the controlling stockholder of Mar-Lees.

time, the plaintiff and O'Donnell, or an entity or entities designated by them, would commence a sequence of acquisitions of Mar-Lees's stock then owned by John Lees that would result ultimately in their ownership of fifty percent of that company's stock for a purchase price of $2.5 million. The tentative agreement included a three-year covenant on the part of the plaintiff "not to solicit business from any customer or account acquired from [Northern Harvest], except in [his] capacity as an employee of Mar-Lees."

Those provisions of the agreement that were intended to be binding forthwith without further negotiation or agreement included section 4.1, entitled "Contingent Profits Interest" (Section 4.1). Section 4.1 acknowledged that the plaintiff was currently employed by Mar-Lees, and that Northern Harvest sales were presently being "booked through Mar-Lees," presumably in contemplation of the consummation of the asset and stock purchases described elsewhere in the agreement. However, recognizing the possibility that the asset and stock transactions might not take place, section 4.1 provides that

> "[i]n the event the Closing[3] fails to occur for any reason, Mar-Lees shall pay John Quinn, commencing on the date John Quinn ceases to be employed by Mar-Lees, continuing royalties equal to 45% of the [Northern Harvest] Profits (as hereinafter defined) on items sold which are not manufactured at a facility owned or leased by Mar-Lees, and 42% of the [Northern Harvest] Profits on items sold which are manufactured at a Mar-Lees facility. For purposes of this letter of intent, the term "[Northern Harvest] Profits" means the net profits on revenues from (i) former customers of [Northern Harvest], and (ii) business developed by John Quinn."

These provisions are the source of the present dispute.

On April 18, 2000, the parties amended and revised the agreement in various respects (amendment). Of relevance to this appeal is paragraph 2 of the amendment, in which the parties

> "hereby acknowledge and agree that for purposes of

---

[3]The "Closing" refers to the initial installment payment for, and conveyance of a portion of, John Lees's stock.

paragraph 4.1 [of the agreement] . . . , 'former customers' are identified as follows:

"a. Demoulas Market Basket, its parent and/or affiliates;

"b. Royal Ahold's affiliates Stop & Shop (excepting 'Bay Scallops'),[4] Bi-Lo, Giant-Landover, Giant-Carlisle (excepting 'Bay Scallops'), and Tops Markets;

"c. Streamline, its parent and/or affiliates;

"d. The Hynes Convention Center and its concessionaire Aramark;

"e. Fenway Park concession operators and/or owners."

The parties further agreed that additional customers could be added in the future, either as "former customers" of Northern Harvest or as "business developed by John Quinn," thus making the plaintiff eligible for royalties on sales by Mar-Lees to such additional customers as well.[5]

By September, 2000, the parties had abandoned their plans to merge the respective companies' operations and to share ownership, and the plaintiff resigned as an employee of Mar-Lees. Efforts by the parties to renegotiate the agreement regarding payment of commissions to the plaintiff or Northern Harvest failed to generate a new written agreement (although Mar-Lees maintains that the parties arrived at an oral contract that replaced the agreement of April 5, 2000). See note 5, *supra.* On October 27, 2000, Mar-Lees terminated its arrangement with the plaintiff, effective October 31, 2000. On November 1, 2000, the plaintiff began working for Channel Fish Processing Company, a competitor of Mar-Lees. Mar-Lees continued to supply fresh sea scallops to Stop & Shop, realizing revenues from such sales that totaled $23,843,010 from the time of the plaintiff's departure to the time of trial.

---

[4]Sales of bay scallops to the customers in question were apparently excluded because Mar-Lees had previously sold bay scallops, as opposed to the larger sea scallops, to such customers prior to its agreement with the plaintiff.

[5]At trial, Mar-Lees contended that the agreement of April 5, 2000, as revised by the amendment, was further amended by an oral agreement of the parties, arrived at in August, 2000. The jury rejected this proposition.

The plaintiff's demand for continuing royalties on all sales of seafood products to Stop & Shop[6] was rejected by Mar-Lees, which interpreted the agreement to entitle the plaintiff to royalties only on Mar-Lees's sales of packaged fish to Stop & Shop (meaning that royalties would be payable with respect to sales of what had been Northern Harvest products previously sold to Northern Harvest customers, but not payable on sales of other products, even though such sales were made to former Northern Harvest customers). This resulted in a refusal by Mar-Lees to pay royalties on its sales of sea scallops (not a former Northern Harvest product) to Stop & Shop, and this litigation followed.

In its appeal, Mar-Lees asserts that the judge erred in instructing the jury regarding the identification of former customers of Northern Harvest, asserting that the term was ambiguous and that it was for the jury to decide who "former customers" were for purposes of the payment of royalties. In support of the proposition, Mar-Lees points to testimony of the plaintiff that it contends constitutes binding admissions that rendered the challenged instruction erroneous. In addition, Mar-Lees argues that the judge erred in describing to the jury the nature of Mar-Lees's defenses and counterclaims, and that it was error to deny its motion for judgment notwithstanding the verdict or for a new trial. In his cross appeal, the plaintiff asserts that the judge abused his discretion in refusing to enter a judgment requiring specific performance of the royalty provisions of the agreement by Mar-Lees in the future.

2. *Instructions regarding "former customers."* As set forth above, Mar-Lees construes the agreement and amendment as entitling the plaintiff to royalties only on sales by Mar-Lees to former customers of Northern Harvest of the specific products such former customers had in fact purchased from Northern Harvest. To this end, Mar-Lees argues that the definition of "former customers" contained in the amendment was intended only to identify who would be considered former customers for this purpose, but was not meant to expand the plaintiff's royalty entitlement to every item that Mar-Lees might sell to those enti-

---

[6]The dispute focuses on sales to Stop & Shop, and does not involve sales to other customers of Mar-Lees even where those other customers appeared on the list of "former customers" of Northern Harvest set forth in the amendment.

ties without regard to whether such items had been sold to them by Northern Harvest in the past. In contrast, the plaintiff, reading the agreement and amendment literally, claims royalties on everything that Mar-Lees sold to Northern Harvest's former customers as specifically identified.

The judge treated the term "former customers of [Northern Harvest]" as a defined contractual term, and instructed the jury accordingly. The instruction was delivered during Mar-Lees's cross-examination of the plaintiff, at which time the judge identified the relationship between section 4.1 of the agreement and the amendment. Specifically, he informed the jury:

> "There is a reference in quotations to former customers [in the amendment], and that makes reference to the use of that term in [section] 4.1. As a matter of law that is a definition of what, quote, former customers, close quote means in the earlier provision. So . . . where it says . . . former customers is a — is identified and that is a definition of a term used in the earlier agreement."

The judge further instructed that "[c]ontracts are permitted to define their terms. And their definitions may match the usual meaning of that term or it may be a special — and specially defined meaning with regard to a term. With regard to what is in the [amendment] that is a definition for the term former customers in the [agreement]." Mar-Lees lodged a timely objection, and now argues that the judge erred in failing to determine that the parties' agreement and subsequent amendment were ambiguous and, consequently, in failing to have the jury decide what the parties in fact intended. See *Commercial Union Ins. Co.* v. *Boston Edison Co.*, 412 Mass. 545, 557 (1992) (meaning of ambiguous contractual provision is question for jury).

We believe that Mar-Lees's argument misconstrues what the judge did. Contrary to Mar-Lees's assertion that the judge, by defining Stop & Shop as a "former customer of [Northern Harvest]," essentially directed the jury to adopt the plaintiff's interpretation of the agreement and amendment, the judge did nothing more than set forth the parties' joint determination (as expressed in the amendment) that Stop & Shop was in fact a former customer of Northern Harvest. By so doing, he did not purport to address what was actually disputed: specifically, the meaning of

the term "items sold" in section 4.1, and whether "items sold" comprehended everything that Mar-Lees sold to a defined "former customer of [Northern Harvest]," or only those items that had previously been sold to that customer by Northern Harvest itself. We see no basis for Mar-Lees's contention that the judge's reiteration of what was said plainly in the amendment (i.e., that, except for bay scallops, Stop & Shop was a former customer of Northern Harvest) somehow pushed the jury in one direction or another in resolving what sales the parties intended to be covered.

With respect to what sales entitled the plaintiff to payment of royalties, the judge implicitly determined that the agreement and amendment were ambiguous and submitted the question of the parties' intentions to the jury. Interpretation of an unambiguous contract invokes questions of law to be decided by the judge. See *Seaco Ins. Co.* v. *Barbosa*, 435 Mass. 772, 779 (2002). In such event, the judge interprets the contract and instructs the jury accordingly, leaving it to the latter to determine whether, and to what extent, there has been a breach of the contract as so construed. It is also "for the judge to rule as matter of law if there [is] an ambiguity in the [contract]." *Diamond Crystal Brands, Inc.* v. *Backleaf, LLC*, 60 Mass. App. Ct. 502, 504-505 (2004). "A term is ambiguous only if it is susceptible of more than one meaning and reasonably intelligent persons would differ as to which meaning is the proper one." *Citation Ins. Co.* v *Gomez*, 426 Mass. 379, 381 (1998). That the parties to an agreement advance different interpretations of it does not by itself mean that the agreement is ambiguous. See *Suffolk Constr. Co.* v. *Lanco Scaffolding Co.*, 47 Mass. App. Ct. 726, 729 (1999).

The judge left no doubt that he considered the term "items sold" susceptible to different meanings, and that he was leaving to the fact finder the decision as to what the expression meant. While he may not have articulated it in this manner, his intentions were clear. He permitted the introduction of evidence by both sides regarding the meaning of the term. As stated above, although he defined for the jury the meaning of "former customers," he did not at any point attempt to define the scope of "items sold." In his final instructions, after advising the jury to

consider whether a subsequent oral agreement had replaced the written agreement and the amendment, he went on to state expressly that, if the written documents were found to control, the jury must "determine what the parties intended with respect to that agreement [and the amendment]." In this regard, he then restated the respective interpretations of the parties, plainly leaving it to the jury to choose.[7]

The judge determined correctly that the agreement and its amendment were susceptible to different, but reasonable, interpretations. See *Citation Ins. Co.* v. *Gomez, supra.* Read literally, section 4.1, in pertinent part, entitles Quinn to continuing royalties on net profits realized by Mar-Lees on items sold to former customers of Northern Harvest, including Stop & Shop. In the circumstances, such language could reasonably have reflected Mar-Lees's recognition that it was acquiring significant business by means of its affiliation with the plaintiff; it was likely to retain much of that business even if the affiliation were not made permanent; and it should compensate the plaintiff for profits realized.[8] On the other hand, the plaintiff could well have understood that the arrangement was an interim one only, entered for the purpose of compensating the plaintiff during a temporary period of employment by Mar-Lees. It was for the jury to decide what the parties' shared understandings were.

Our view is not altered by Mar-Lees's contention that certain testimony of the plaintiff constituted a "judicial admission" that conclusively established the meaning of the agreement and

---

[7]The judge instructed in part: "If you find that the written agreement was governing [which the jury did], then you must determine whether the language of the agreement is clear or whether there is ambiguity in the agreement. And if there is ambiguity then you need to resolve that ambiguity and determine what the parties intended with respect to that agreement." We are not enthusiastic about this particular formulation, because whether a contract is ambiguous is a question of law, and the judge had effectively already determined that the agreement and amendment were ambiguous with respect to covered sales. The instruction did, however, convey accurately that the jury had to decide which party's construction of the agreement and amendment were correct.

[8]Likewise, there being evidence that Northern Harvest never sold bay scallops to Stop & Shop, the exclusion of bay scallop sales in the reference to Stop & Shop in the April 18, 2000, amendment would be superfluous if sales eligible for royalties were restricted to items previously sold by Northern Harvest.

amendment in accordance with Mar-Lees's interpretation. On cross-examination, the plaintiff agreed that he was not asserting that Stop & Shop had been a former customer of Northern Harvest for sea scallops. As a follow-up question, Mar-Lees's counsel asked, "In fact, sir, your claim in this case is for business developed, under Section 4.1, isn't that right?" The judge overruled an objection, and the plaintiff answered in the affirmative. Mar-Lees argues essentially that the judge erred in refusing to treat these statements as judicial admissions that bound the plaintiff to the propositions that sales of sea scallops to Stop & Shop were not covered by the royalty provisions of the agreement and that, in any event, the plaintiff was seeking recovery only under the provision for "business developed" rather than pursuant to the provision regarding "former customers." Mar-Lees attacks particularly the judge's definition of "former customer" as including Stop & Shop because, so the argument goes, the plaintiff's own testimony established that Stop & Shop had in fact not been such a customer.

"A judicial admission is a proposition of fact in the form of acts or declarations during the course of judicial proceedings which conclusively determine an issue." *Wood* v. *Roy Lapidus, Inc.*, 10 Mass. App. Ct. 761, 765 (1980). To be binding as a judicial admission, testimony must relate "to facts within the peculiar knowledge of the [party]." *Reynolds* v. *Sullivan*, 330 Mass. 549, 552 (1953). Statements that amount to conclusions of law are not susceptible to treatment as judicial admissions. See *Wood* v. *Roy Lapidus, Inc., supra.* There are certain occasions in which testimony, together with conduct by counsel, has been deemed to constitute a judicial admission regarding a theory of recovery or a legal defense. See *Bouley* v. *Reisman*, 38 Mass. App. Ct. 118, 129 (1995). "All the cases cited for that proposition, however, concern the failure of an attorney to object when, during trial, an issue or theory of defense was either said not to be an issue or to be the only one in issue." *Ibid.* See *Dalton* v. *Post Publishing Co.*, 328 Mass. 595, 599 (1952); *Owens* v. *Dinkins*, 345 Mass. 106, 111 (1962).

Here, the judge correctly rejected Mar-Lees's contention that the plaintiff's statements were binding either on the meaning of the written agreement and amendment or on the nature of his

claim. That Northern Harvest had not sold sea scallops to Stop & Shop in the past would have been known to the plaintiff and was presumably factually accurate. But that fact had no bearing on the construction of a subsequent agreement and amendment that could permissibly be interpreted as obligating Mar-Lees to pay royalties on its sales of sea scallops to Stop & Shop without regard to whether Northern Harvest had made such sales in the past, and the plaintiff's response to the question was not intended to suggest otherwise. With respect to the plaintiff's testimony that his claim was one for royalties on "business developed," the judge rightly declined to recognize the statement as a judicial admission on the ground that it was a legal conclusion drawn by a lay witness. Furthermore, there was no waiver arising from any acquiescence by counsel. The plaintiff's counsel not only objected during the cross-examination, but made it clear throughout that a recovery was sought under the "former customer" provision of section 4.1.

3. *Instructions regarding Mar-Lees's affirmative defenses and counterclaims.* While denying that it had committed a breach of any agreement with the plaintiff, Mar-Lees asserted alternatively that prior breaches by the plaintiff excused it from performance of any contractual obligation it would otherwise have had. The contention is also set forth in Mar-Lees's counterclaims seeking damages for the plaintiff's alleged breaches. Mar-Lees contends on appeal that the judge erred in his instructions by describing its defenses and counterclaims inaccurately, and by defining the plaintiff's fiduciary obligations in too narrow a fashion.

Mar-Lees's claim that the plaintiff himself committed a breach of his contractual obligations relates in part to the plaintiff's position as an employee of Mar-Lees in accordance with the agreement and in part to his purported position as an exclusive sales agent for Mar-Lees pursuant to an alleged oral agreement of August, 2000. Mar-Lees's contentions arise from evidence that, commencing in July, 2000, while governed by the written agreement, the plaintiff engaged in conversations that explored his possible departure from Mar-Lees; subsequent transfer of Northern Harvest's tray pack fish business to Channel Fish Processing Company (Channel); and sales of the tray pack fish product to Demoulas supermarkets.

There was evidence as well that, at the plaintiff's request, Mar-Lees removed him as a salaried employee and placed him on a "commission only" basis effective September 1, 2000. The plaintiff and John Lees conducted discussions regarding a more encompassing agreement to replace section 4.1 of the agreement, and Northern Harvest's counsel forwarded a draft agreement to Mar-Lees. The draft provided for cancellation of section 4.1; royalty payments to be made to Northern Harvest, rather than to the plaintiff, on the first and fifteenth of every month; proper accountings to be provided to Northern Harvest; royalties for Stop & Shop business to be maintained at forty-two percent of net profits; royalties for all other business, including Demoulas and Streamline, to be standardized at twenty-seven and one-half cents per pound; and an exclusive license to use the Northern Harvest name to be granted to Mar-Lees. The proposed agreement was never signed and there were no further efforts to negotiate a new arrangement. In addition, an earlier written agreement whereby Northern Harvest would assign its trademark to Mar-Lees was never executed.

On September 20, 2000, Mar-Lees made its first royalty payment with respect to sales occurring between September 1 and September 15, 2000. The payment appears to have been made in accordance with the parties' attempts, never reduced to an executed written agreement, to negotiate a new arrangement. Thus, Mar-Lees paid Northern Harvest, not the plaintiff, and did so at rates of forty-two percent of net profit on sales of fresh sea scallops to Stop & Shop, and twenty-seven and one-half cents per pound on sales of fish to Demoulas and Streamline. However, in an accompanying handwritten letter, Lees notified the plaintiff that Mar-Lees would not thereafter pay in accordance with the parties' recent discussions, but would instead adhere to the agreement. He reiterated this on October 5, 2000, by writing that "effective September 16 the profits division in the letter of intent [i.e., the agreement] will apply and our payments will be based on profits until we agree on an alternative formula."

On October 10, 2000, Mar-Lees sent a second royalty check. This precipitated disagreements between the parties regarding

what understandings were to control.[9] Mar-Lees made no further royalty payments. By letter dated October 27, 2000, Mar-Lees terminated its agreement with the plaintiff and Northern Harvest effective October 31, 2000, and stated its intention not to pay further commissions thereafter. On November 1, 2000, the plaintiff began his affiliation with Channel, and shortly thereafter Channel began to supply Demoulas with the tray pack fish product. The plaintiff attempted, subsequent to his departure from the defendant, to persuade Stop & Shop to transfer its sea scallops business to Channel, but Stop & Shop declined and remained with Mar-Lees.

The judge instructed accurately and comprehensively regarding the plaintiff's obligations either as an employee under the agreement, or as an independent contractor or sales agent under the alleged oral agreement of August, 2000. In this regard, he charged correctly that the plaintiff, while obligated to Mar-Lees either as an employee or as an exclusive sales agent, could, absent a noncompete agreement, plan to compete with Mar-Lees in the future, and could even make arrangements to do so, but could not permissibly solicit Mar-Lees's customers while still working for Mar-Lees. See *Augat, Inc.* v. *Aegis, Inc.*, 409 Mass. 165, 172 (1991). Mar-Lees does not object to these aspects of the instructions.

Mar-Lees contends first that the judge erroneously narrowed its defenses and counterclaims by instructing only that the plaintiff could breach his agreements with Mar-Lees by seeking to sell fish to Demoulas through Channel while he was still employed by, or working exclusively for, Mar-Lees. Mar-Lees objected below, arguing there and here that its claim was more expansive than the judge's characterization of it; the plaintiff had "an affirmative obligation to support and maintain the [Northern Harvest] brand . . . while he was an employee and a commissioned sales representative"; and accordingly the instruction reduced the scope of the plaintiff's responsibilities that Mar-Lees

---

[9]An irony, one presumably not lost on the jury, was that, at the time of the disagreements in October, 2000, the plaintiff sought implementation of the trial royalty arrangement embraced by the discussions of a new contract, whereas Mar-Lees insisted on the provisions of the written agreement of April 5, 2000. By the time of trial, the parties had reversed these positions. The jury subsequently found that the April 5, 2000, agreement was the operative one.

asserted had been breached. The judge declined to give the formulation requested, stating that he had given in substance what Mar-Lees sought. We agree.

The judge informed the jury that Mar-Lees contended that (1) the plaintiff committed a breach of the duty of loyalty that he owed to his employer during the period in which he was employed by Mar-Lees; and (2) after becoming an independent contractor pursuant to the alleged oral agreement of August, 2000, the plaintiff committed a breach of his obligation to sell exclusively for Mar-Lees and not to sell the products of any other fish company. We fail to see how this does not encompass Mar-Lees's theory of the case, including both its contention that the plaintiff was contractually obligated to support the Northern Harvest brand and its allegation that the plaintiff, while an agent of Mar-Lees, sought to develop a new arrangement whereby Channel would sell the Northern Harvest branded product to Demoulas. Where the judge had instructed on the subject, he was not required to repeat himself in words chosen by a party. See *Jacobs* v. *Pine Manor College*, 399 Mass. 411, 414 (1987). Furthermore, the judge charged that an independent contractor or sales agent is bound by the terms of the contract with the principal. Thus, had the jury found that there was an oral agreement that bound the plaintiff to an exclusive relationship with Mar-Lees, they were plainly informed by the instructions that the plaintiff's solicitation of Demoulas or Channel might violate such an understanding. The instructions addressed adequately the substance of Mar-Lees's contentions. See *Cherick Distribs., Inc.* v. *Polar Corp.*, 41 Mass. App. Ct. 125, 129 (1996).

Mar-Lees articulates essentially the same argument in different terms by asserting that the judge erred in rejecting its requests that the jury be instructed (1) on the obligation of corporate officers not to compete with the corporation or deprive it of business opportunities; and (2) on the obligation of agents to act solely for the benefit of their principals. As the judge observed, this is not a corporate opportunity case, and the instruction sought by Mar-Lees regarding the obligations of corporate officers added nothing to what the jury needed to know. As set forth *supra*, the judge instructed accurately on the responsibilities of agents. The jury found, in any event, that an oral

agreement changing the plaintiff's position from that of employee to exclusive sales agent with special obligations to promote the Northern Harvest brand never existed. This being the case, even had there been error in the instructions regarding the alleged agent agreement, such an error would have been meaningless. See Mass.R.Civ.P. 61, 365 Mass. 829 (1974); *Coca-Cola Bottling Co. of Cape Cod* v. *Weston & Sampson Engrs., Inc.,* 45 Mass. App. Ct. 120, 123-124 (1998) (error in instructions must affect substantial rights of party).

4. *Motion for judgment notwithstanding the verdict or new trial.* Mar-Lees contends that the judge erred in denying its motion for judgment notwithstanding the verdict or, alternatively, for a new trial. It argues that the judge's finding that the plaintiff was entitled to royalties is not supported by the evidence or, at a minimum, is against the weight of the evidence because any royalty entitlement belonged not to the plaintiff, but to Northern Harvest. Similarly, Mar-Lees asserts that the amount of the verdict was excessive because the plaintiff went to work for Channel immediately after the effective date of termination of his agreement with Mar-Lees (October 31, 2000), continued to sell fish products, and consequently incurred no damages.

The judge applied the proper criteria in considering the different aspects of the motion. The request for judgment notwithstanding the verdict presents a pure question of law, specifically, whether "anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be drawn in favor of the plaintiff." *Poirier* v. *Plymouth,* 374 Mass. 206, 212 (1978), quoting from *Raunela* v. *Hertz Corp.,* 361 Mass. 341, 343 (1972). The motion for a new trial is addressed to the judge's discretion. See *Kuwaiti Danish Computer Co.* v. *Digital Equip. Corp.,* 438 Mass. 459, 466-467 (2003). The judge is called on to determine whether the jury made an honest and reasonable judgment in accordance with controlling legal principles; whether its verdict was against the weight of the evidence; or whether the verdict resulted from "bias, misapprehension or prejudice." *Turnpike Motors, Inc.* v. *Newbury Group, Inc.,* 413 Mass. 119, 127 (1992), quoting from *Scannell* v. *Boston Elev. Ry.,* 208 Mass. 513, 514 (1911).

Applying these standards, the judge ruled correctly that the verdict was supported by the evidence, and acted within his discretion in denying Mar-Lees's motion for a new trial. Mar-Lees's contention that royalties, if any, were owed to Northern Harvest rather than to the plaintiff is based entirely on the alleged oral agreement of August, 2000. The jury permissibly found that the parties never entered into an oral agreement, and that the agreement, and amendment, remained operative. This determination was plainly warranted, given that the parties never completed an attempt to reduce the replacement agreement to writing, and that Mar-Lees rejected the plaintiff's prelitigation efforts to have royalties paid in accordance with a new understanding. It was for the jury to unravel the parties' shifting and conflicting positions on the subject.

Mar-Lees's assertion that excessive damages were awarded is based on two premises: that the agreement was terminable at will, see *Simons* v. *American Dry Ginger Ale Co.*, 335 Mass. 521, 524 (1957) (contract without specific duration may be terminable at will upon reasonable notice); and that the plaintiff's affiliation with Channel immediately upon termination of the agreement was a "substitute arrangement," see *Teitelbaum* v. *Hallmark Cards, Inc.*, 25 Mass. App. Ct. 555, 560 (1988) (construing G. L. c. 106, § 2-309[3]), that resulted in the plaintiff suffering no loss.

These propositions ignore the fact, however, that the plaintiff's royalty entitlement under the agreement and amendment were not affected either by termination of the agreement or by the plaintiff's contractual arrangements with other parties in the future. The plaintiff had already performed by virtue of Stop & Shop, a former customer of Northern Harvest, deciding to do business with Mar-Lees, and the plaintiff was entitled to royalties to the extent that Mar-Lees profited from those sales. Nothing further was required of the plaintiff with respect to Stop & Shop, and nothing in section 4.1 permitted Mar-Lees to terminate unilaterally a benefit that the plaintiff had already earned. See *Phelps* v. *Shawprint, Inc.*, 328 Mass. 352, 357 (1952). On the contrary, section 4.1 provided expressly that the royalty provision would govern if and when the plaintiff left Mar-Lees, and his future destination in terms of employment or independent

contractual relationships was not limited by a noncompete agreement.

5. *Specific performance.* In his cross appeal, the plaintiff asserts that the judge erred in denying his prayer for a judgment that section 4.1 be specifically enforced posttrial. The plaintiff argued, in this regard, that section 4.1 called for continuing royalties as long as Mar-Lees realized a net profit on products sold to Stop & Shop, and that any attempt to prove at the time of trial what his future entitlement might be would be unacceptably speculative.[10] The judge declined to grant specific performance, concluding that "equity is not done" and "justice is not served" by paying the plaintiff "in perpetuity" more than he had already been awarded in damages for what, the judge suggested, was a limited contribution to the business relationship between Stop & Shop and Mar-Lees.[11]

"A judge has a 'reasonable range' of discretion to grant or deny specific performance." *Kaplan* v. *Bessette*, 357 Mass. 233, 235 (1970), quoting from *Raynor* v. *Russell*, 353 Mass. 366, 367 (1967). *Roberts-Neustadter Furs, Inc.* v. *Simon*, 17 Mass. App. Ct. 262, 270 (1983). A judge should consider whether a grant of specific performance "will result in imposing an undue hardship upon one party to an agreement or permit the other party to obtain an inequitable advantage." *Freedman* v. *Walsh*, 331 Mass. 401, 406 (1954). "On the other hand, agreements are made to be performed, and relief should be given in the absence of special circumstances showing that it would be inequitable to do so." *Ibid.* While specific performance is most commonly sought in real estate transactions, it may also be appropriate, for example, "where repeated actions to recover monthly damages as they are incurred would be needed." *Fleming* v. *Fleming*, 34 Mass. App.

---

[10]Among other possibilities, Mar-Lees could make less profit on sales to Stop & Shop; could lose Stop & Shop as a customer; or could go out of business altogether. Consequently, the plaintiff would be entitled to smaller royalties than in the past, or even no royalties at all.

[11]The judge viewed the plaintiff's role as limited to introducing Philip Walsh, Stop & Shop's seafood buyer, to Jack Morris, Mar-Lees's scallop expert, with Morris essentially responsible for convincing Walsh to buy from Mar-Lees. There was evidence that the plaintiff in fact played a considerably greater role, but the judge was entitled to weigh the testimony in making his own findings on the claim for specific performance. See *Kaplan* v. *Bessette*, 357 Mass. 233, 234 (1970).

Ct. 913, 913 (1993). The plaintiff argues that the standard of review of this case is de novo, because it had already been determined that the agreement and amendment control, and section 4.1 confers on the plaintiff the right to continuing royalties. Whether such a right exists, however, does not by itself dictate whether equitable relief to enforce the right should be granted. See, e.g., *Roberts-Neustadter Furs, Inc.*, 17 Mass. App. Ct. at 269-270 & n.4 (though plaintiff's exercise of option on final day strictly complied with contract, question remained whether specific performance should be granted).

Accordingly, we examine the judge's decision from the viewpoint of whether there has been an abuse of discretion. See *Carey's, Inc.* v. *Carey*, 25 Mass. App. Ct. 290, 301 (1988). In so doing, we find his expressed reason for denying relief problematic. The judge was unquestionably justified in considering the fairness of a specific performance order. See *Shikes* v. *Gabelnick*, 273 Mass. 201, 206 (1930) ("If [a plaintiff] has been guilty of unfair conduct, though not enough to warrant a rescission of the agreement, specific performance is refused because of his inequitable and unfair conduct"); *Economy Grocery Stores Corp.* v. *Mc-Menamy*, 290 Mass. 549, 552 (1935) (specific performance "will not be granted if the conduct of the plaintiff is savored with injustice touching the transaction, even though there is no sufficient ground for the rescission of the contract"); *Kaplan* v. *Bessette*, 357 Mass. at 235 ("no evidence of inequitable conduct or dishonesty . . ."); *Roberts-Neustadter Furs, Inc.* v. *Simon*, 17 Mass. App. Ct. at 270 (grant of specific performance dependent on resolution of questions arising out of inequities brought about by "plaintiff's negotiation of a new lease and delay in exercising the option"); *Galipault* v. *Wash Rock Invs., LLC*, 65 Mass. App. Ct. 73, 85 (2005) ("it is axiomatic that one must have behaved equitably in order to obtain equitable remedies").

The judge, however, made no finding that the plaintiff acted unfairly or inequitably during his contract negotiations with Mar-Lees or in his performance of the agreement. Nor did the judge find that specific performance would work a hardship to Mar-Lees, particularly given that Mar-Lees continued to realize substantial income from its sales to Stop & Shop after the plaintiff left its employment. Rather, he denied specific performance

because he determined that the plaintiff's contributions to the transfer of Stop & Shop's business to Mar-Lees were relatively minor, and that therefore equitable relief enabling the plaintiff to make even more money from the arrangement should not be granted.[12]

We do not believe that the judge is entitled to second-guess the wisdom of the parties' agreement in this fashion. The agreement and amendment were negotiated at arms' length by sophisticated parties, and Mar-Lees presumably understood that it could be committing itself to substantial payments in return for obtaining business from Northern Harvest's former customers. Had Mar-Lees desired performance from the plaintiff that was more serious or longer in duration, it could have sought to contract for it. Instead, it was content to enter into section 4.1 as written, thus obligating itself to compensate the plaintiff with respect to its sales to Stop & Shop. Mar-Lees's belief that this business arrangement was in its interest is not subject to judicial review. Indeed, the basis for the decision is found in the fact that Mar-Lees apparently continues to benefit from its relationship with Stop & Shop to this day. We reject the implication that there is an equation between the agreement's requirement of minimal effort in return for continued payments and inequitable behavior on the part of the plaintiff. The plaintiff did what he was obligated to do under the agreement, and is entitled to the bargained-for consideration.

Despite this, we conclude that the denial of specific performance is justified on a different ground. By its verdict, the jury determined that the agreement and amendment had not been supplanted by a subsequent oral argument, and that section 4.1 of the agreement remained the governing contractual provi-

---

[12]He found in this regard: "It was Morris, not Quinn, who persuaded Walsh that, despite Stop & Shop's earlier problems with the quality of sea scallops Mar-Lees had sold in the past to Stop & Shop, he should give Mar-Lees a second chance. While Walsh knew that he could call Quinn with any problems in that renewed relationship, Walsh depended on Morris, not Quinn, to ensure that Mar-Lees sold Stop & Shop sea scallops of consistent high quality. In short, Quinn's prior relationship with Walsh was what brought Walsh and Morris together, but it was Morris, not Quinn, who was instrumental in Walsh's decision to again purchase sea scallops from Mar-Lees and it was Morris, not Quinn, who Walsh relied upon to ensure the continued high quality of the sea scallops he was purchasing for Stop & Shop."

sion regarding the plaintiff's entitlement to royalties. Section 4.1 provides for continuing royalties. Indeed, the judge acknowledged the scope of the claim during preliminary discussions by stating: "[S]o basically, if you win you get not merely damages with respect to . . . royalties post-termination, but also a declaration that as long as Stop & Shop keeps buying scallops from Mar-Lees, he is entitled to a cut of that."

The jury verdict, together with the plain language of the agreement, is the equivalent of a declaration that royalties are due the plaintiff for as long as Mar-Lees realizes a profit on sales to Stop & Shop. With the rights of the parties under the agreement now clearly established, we have no basis for concluding that Mar-Lees will not fulfil its contractual obligation. A judgment of specific performance adds nothing, except to embroil the trial court in possible contempt proceedings should there be allegations of noncompliance. There being nothing in the present record that would justify defenses of claim or issue preclusion, and the judge not having suggested otherwise, the plaintiff has an adequate remedy at law should there be a breach on the part of Mar-Lees in the future.

*Judgment affirmed.*

*Order denying defendant's motion for judgment notwithstanding the verdict or for new trial affirmed.*

*Order denying plaintiff's motion for specific performance affirmed.*