Donald E. STRANGE,
Plaintiff/Counterclaim Defendant,

v.

GENESIS INSURANCE COMPANY,
Defendant/Counterclaim
Plaintiff.

Civil Action No. 06–10290–RCL.

United States District Court,
D. Massachusetts.

Feb. 28, 2008.

Mark E. Cohen, The McCormack Firm LLC, Boston, MA, for Defendant.

Julie A. Frohlich, Goulston & Storrs, PC, Boston, MA, for Counter Claimant/Plaintiff.

Charles C. Lemley, Wiley Rein LLP, Washington, DC, for Counter Defendant/Counter Claimant.

David H. Topol, Wiley Rein LLP, Washington, DC, for Counter Claimant/Defendant.

*MEMORANDUM AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S CROSS–MOTION FOR SUMMARY JUDGMENT*

REGINALD C. LINDSAY, District Judge.

Before me are cross-motions for summary judgment filed by Donald E. Strange ("Strange") and Genesis Insurance Company ("Genesis") in the above action. Genesis has moved for summary judgment on all counts of the complaint filed by Strange, as well as on all counts of the counterclaim it subsequently filed against Strange. Strange has moved for summary judgment on count I of his complaint and on all counts of the counterclaim that Genesis filed against him. Upon consideration of the papers submitted in support of and in opposition to the parties' motions, and the arguments made by counsel at the hearing held on December 17, 2007, I make the following rulings.[1]

## I

This case focuses on the proper interpretation of provisions of a contract of insurance. Count I of Strange's complaint alleges that Genesis breached that contract by refusing to honor Strange's demand for coverage under Genesis Policy Number YXB001429 ("Policy"), a directors and officers liability insurance policy that Genesis issued to First New England Dental Centers, Inc. ("FNEDC") for the policy period of May 17, 1997, to May 20, 1998. As an officer of FNEDC, Strange was entitled to indemnification and reimbursement of defense costs with respect to any loss covered by the Policy. Strange sought coverage for the defense costs he incurred as a defendant in *Imprimis Investors, LLC, and Wexford Spectrum Investors, LLC v. KPMG Peat Marwick LLP et al.*, Civil Action No. 99–5312B, a suit commenced in Suffolk (Massachusetts) Superior Court on November 4, 1999, which, as the parties have done in their briefs, I refer to herein as the "Underlying Litigation."

Genesis contends that the Policy does not cover Strange because of the Policy's so-called Insured versus Insured exclusion (the "exclusion"). The exclusion applies to a claim made against directors or officers of FNEDC by, *inter alia*, "any security holder of the COMPANY, whether directly or derivatively, unless such CLAIM is instigated and continued totally independent of, and totally without the solicitation of, or assistance of, or active participation of, or intervention of, any DIRECTOR or OFFICER." Policy, Section IV.K., Def.'s Ex. A. Genesis maintains that Imprimis, a plaintiff in the Underlying Litigation, was a security holder in FNEDC, and that four directors and officers of FNEDC, most notably one Kenneth Rubin, assisted or actively participated in Imprimis's suit against Strange. Strange argues that the exclusion does not apply because Imprimis was not a "security holder" in FNEDC at the relevant times, and that even if Imprimis had been a "security holder" at such times, Rubin's role in the Underlying Litigation did not rise to the degree of assistance or participation that invokes the exclusion.

---

1. Because the parties have filed cross-motions for summary judgment, I must determine whether each motion, separately considered, permits judgment to be entered in accordance with the standards of Fed.R.Civ.P. 56. *Bienkowski v. Northeastern Univ.*, 285 F.3d 138, 140 (1st Cir.2002).

## A.

In resolving the motions before me, I am guided by the following principles of Massachusetts law. "Under Massachusetts law, insurance-contract interpretations pose legal issues for resolution by the court, and, absent ambiguity, insurance contracts are to be enforced in accordance with their plain language.... [I]nsurance policies should be construed as a whole without according undue emphasis to any particular part over another. Only where a contractual term is ambiguous does its interpretation pose a question of fact, and though the parties may adduce extrinsic evidence of their respective intendments, any residual ambiguity must be resolved against the insurer.... [C]overage exclusions are to be strictly construed against the insurer." *Utica Mut. Ins. Co. v. Weathermark Invs., Inc.,* 292 F.3d 77, 80 (1st Cir.2002) (citations and internal quotation marks omitted). When the terms of an exclusion, however, are "plain and free from ambiguity," the court does not "construe them strictly against the insurer." *Bagley v. Monticello Ins. Co.,* 430 Mass. 454, 457 n. 2, 720 N.E.2d 813 (1999) (citation omitted). "[A] contract term is ambiguous when its language is 'reasonably prone to different interpretations' or 'susceptible to differing, but nonetheless plausible, constructions.'" *Lanier Prof'l Servs., Inc. v. Ricci,* 192 F.3d 1, 4 (1st Cir.1999) *quoting Alison H. v. Byard,* 163 F.3d 2, 6 (1st Cir.1998); *see also Mass. Prop. Ins. Underwriting Ass'n v. Wynn,* 60 Mass.App.Ct. 824, 827, 806 N.E.2d 447 (2004) ("While reading and understanding an insurance policy's provisions as to coverages, exclusions, and exceptions is often a formidable task, difficulty in comprehension does not equate with ambiguity."). "An insurance contract is to be interpreted according to the fair and reasonable meaning of the words in which the agreement of the parties is expressed." *Allmerica Fin. Corp. v. Certain Underwriters at Lloyd's, London,* 449 Mass. 621, 628, 871 N.E.2d 418 (2007) (quotation marks omitted). The construction of contracts involving insurance is no different a task from interpreting any other contract; the words of the policy must be construed "in their usual and ordinary sense." *Hakim v. Mass. Insurers' Insolvency Fund,* 424 Mass. 275, 280, 675 N.E.2d 1161 (1997).

Reading the exclusion in the context of the Policy as a whole, I conclude that the term "security holder," as used in the exclusion, is unambiguous—that is, I find that the word "security" should be taken in its plain and ordinary sense, and that "security holder" includes holders of securities of all kinds, including holders of stock, notes and warrants. Strange has argued that the term cannot be read to include holders of stock—that it must be read narrowly to mean only holders of a security interest in assets of FNEDC. That narrow reading is undermined by, among other things, the words that immediately follow the term "security holder" in the exclusion. The exclusion concerns lawsuits brought by any security holder, "whether directly or derivatively." This reference to potential "derivative" lawsuits clearly sweeps within the exclusion any claims asserted in the name of FNEDC by shareholders of FNEDC, unless coverage for such claims is saved by the exclusion's exception clause. "Every word in an insurance contract must be presumed to have been employed with a purpose and must be given meaning and effect whenever practicable." *Allmerica,* 449 Mass. at 628, 871 N.E.2d 418 (internal quotation marks omitted). In order for the "derivative" term to have meaning and effect, a "security holder" cannot merely be the holder of a security interest in the company's assets. Rather, the term "security

holder" must, at the very least, also include stockholders.

Strange makes much of the fact that the exclusion employs the term "security holder," with the word "security" in its singular form. He argues that the use of that form implies a narrow reading of the term, or at least that there is an ambiguity in the term which should be construed against Genesis.

That argument, however, does not carry the weight that Strange attributes to it. The Policy variously uses the term "security" in both its singular and plural forms to refer to securities of all kinds. For example, the Policy precludes coverage for claims involving "the purchase or sale or offer or solicitation of an offer to purchase or sell any *security;* or ... the violation of any of the provisions of the Securities Act of 1933 as amended [or] the Securities Exchange Act of 1934 as amended, ... [p]rovided, however, this exclusion shall not apply to the purchase or sale or offer or solicitation of any offer to purchase or sell any *security* which the DIRECTORS and OFFICERS reasonably believed to be exempted within the meaning of Regulation D of the Securities Exchange Act of 1933...." Policy § IV(O), Endorsement Form GIC–7422, June 9, 1997 (*emphasis added*). On the other hand, in other endorsements, the Policy uses the plural form of the term "security." Two identical endorsements, for example, define a "securities claim" as any claim "brought by any person or entity, directly or derivatively, based upon, arising out of, or attributable to, the purchase or sale or offer to purchase or sell any *securities* of the COMPANY ..." Policy § II.K as amended by Endorsement Form GIC–7425.A, Dec. 22, 1997, Mar. 24, 1998, (*emphasis added*).[2] There is, therefore, no particular significance for the present controversy of the use of the singular form of the term "security" in the exclusion. To be sure, the drafters of the Policy could have done a better job, but I find no ambiguity in the term "security holder" when it is viewed in the context of the Policy as a whole. Reading the Policy as a whole, I conclude that it would be unreasonable to ascribe to the term "security holder" any definition other than its plain and ordinary one, which includes a holder of a security interest in FNEDC's assets but also includes, *inter alia,* a holder of the company's stocks and warrants. *See also Black's Law Dictionary* 1384–87 (8th ed.2004) (definition of "security").

**B.**

 I also determine that Imprimis was a security holder of FNEDC at the relevant time, that is, when the relevant claim was made. The Policy is a claims-made policy, and, as noted earlier, the exclusion applies to "any CLAIM made against the DIRECTORS or OFFICERS ... by any security holder of the COMPANY." " 'Claims-made' policies cover claims arising out of incidents that occurred during or prior to the policy period, depending on the terms of the policy, but only if a claim is made during the policy period. With claims-made policies, the insured event is the claim." *Edwards v. Lexington Ins. Co.,* 507 F.3d 35, 38 n. 2 (1st Cir.2007).

The Policy had expired by the time the Underlying Litigation was brought in November of 1999. Thus, the Policy, by its terms, only covers Strange's costs in defending the Underlying Litigation if Strange's claim for coverage arose from the same wrongful acts, or wrongful acts

---

**2.** I note that these endorsements, like the exclusion, employ the modifying language "directly or derivatively" in defining a securities claim.

that were "interrelated" with those that formed the basis of the claim Strange made in May of 1998 in connection with an adversary proceeding initiated by the Trustee in bankruptcy in a voluntary Chapter 11 bankruptcy proceeding commenced by FNEDC.[3] Strange himself has claimed that the Underlying Litigation arose from or is related to alleged wrongful acts that were first identified in an April 1998 letter from Strange to Genesis—alleged wrongful acts that later were raised in the bankruptcy adversary proceeding. *See* Pl.'s Resp. to Def.'s First Set of Interrogs. 4 at 10, Def.'s Ex. D ("Here, the same wrongful act—alleged misrepresentations allegedly made by Mr. Strange that Imprimis relied upon to its detriment and which induced Imprimis to lend $15 million to FNEDC—was the basis for the Underlying Litigation as well as the claims first asserted against Mr. Strange during the policy period. The Underlying Litigation therefore arises

from an 'INTERRELATED WRONGFUL ACT' and, pursuant to Section V.B of the policy, falls within the policy year (May 17, 1997 to May 20, 1998) in which the earliest claim arising out of this wrongful act first was made.").

Strange argues, however, that, properly read, the exclusion does not apply unless the security holder maintains its status as security holder at all times relevant to the claim, including throughout the pendency of the Underlying Litigation. The point is an important one because, Strange argues, Imprimis was not a security holder at the time of the participation of Rubin and other Imprimis directors in the Underlying Litigation.

The language of the exclusion itself does not in express or implied terms accord with Strange's view. The exclusion is tied to the claim, defined as "proceedings initiated against a DIRECTOR or OFFICER . . . . ." Policy § II.J, as amended by

---

**3.** On February 13, 1998, FNEDC filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the bankruptcy court of this district. Genesis's Statement of Undisputed Facts in Supp. of its Mot. for Summ. J. ("Genesis's SOF") ¶¶ 27; *see* Pl.'s Ex. 13 at 1 (Bankruptcy Court docket). On April 7, 1998, Strange forwarded to Genesis a letter which FNEDC's Chief Financial Officer had received from Imprimis's attorneys on April 3, 1998, that stated that Imprimis was investigating potential claims against certain FNEDC directors and officers. Genesis's SOF ¶¶ 28, 30. On May 19, 1998, the Trustee in the FNEDC bankruptcy case commenced an adversary proceeding against Strange and other officers and directors of FNEDC. *Id.* ¶ 31. The adversary complaint included a claim for misrepresentation and/or deceit based on alleged misrepresentations made to FNEDC's creditors (which would include Imprimis) regarding FNEDC's financial condition. Pl.'s Additional Facts in Supp. of His Opp. to Genesis's Mot. for Summ. J. ¶ 2. Strange asserts in this case that the Underlying Litigation arises from the same or interrelated allegedly wrongful acts as were alleged against him in the bankruptcy proceeding, and that his April

7, 1998 communication to Genesis was proper and timely notice of that claim against him.

Under the Policy, a claim for coverage of costs associated with the Underlying Litigation can only be a claim made under the policy if it arises out of the same "WRONGFUL ACT or fact, circumstance or situation, or any INTERRELATED WRONGFUL ACT, or fact, circumstance or situation" as a claim made during the policy period. Policy § V.B. "Interrelated Wrongful Acts" are "WRONGFUL ACTS which have as a common nexus any fact, circumstance, situation, event, transaction or series of facts, circumstances, situations, events or transactions." *Id.* § II.E.

The defendant forgoes any argument, on the present motion, that the Underlying Litigation and Strange's claim in connection with the bankruptcy proceeding should be treated as a single claim under the Policy, but seeks to preserve that argument should it not prevail on the plaintiff's present motion for summary judgment. *See also* Strange's Mem. in Opp'n 4 & n. 3 (disputing any potential future argument by Genesis that "the 'CLAIM' was not first made during the Policy Period").

Endorsement Form GIC–7425.P7ENH, July 31, 1977. If the claim here is cognizable at all under the Policy, it is because of the relationship between the wrongful acts asserted in the Underlying Litigation and those asserted in connection with the bankruptcy proceeding. One limitation that the Policy imposes on a claim is temporal: the claim must be made within the policy period or be related to a claim made during the policy period. The Policy imposes a second limitation on covered claims in the form of the exclusion. Just as a claim itself is forever defined by the Policy's terms, as they existed during the policy period, so too are the limitations on that claim, unless the Policy provides otherwise. And if a limitation would have precluded coverage of a claim filed during the policy period, that limitation would apply to all stages of any litigation involving that claim.

The interpretation the plaintiff proposes would give him the benefit of the relation-back feature of Policy's coverage provisions, without the burden of those provisions; that is, Strange would get the benefit of coverage of an otherwise untimely claim, by predicating that coverage on its relation to a timely claim, without acknowledging that the timely claim was limited by the exclusion. It cannot reasonably be

supposed that the Policy should be read to mean that if Strange had made a claim within the policy period, coverage would have been precluded, but having made a claim after the policy period expired, he would have coverage. Strange's argument that a past security holder of FNEDC is not covered by the exclusion thus is simply misplaced.[4]

The parties do not dispute that as of April/May 1998, Imprimis owned FNEDC common stock it had acquired in January of that year. *See* Genesis's SOF ¶¶ 24–26. The exclusion applies to "any CLAIM made" against directors or officers by security holders, and the security holder (Imprimis) was a present security holder at the time the claim was made. The exclusion thus applies to Strange's claim made in connection with the Underlying Litigation.

## C.

There remains the question of whether the Underlying Litigation was "continued totally independent of, and totally without the solicitation of, or assistance of, or active participation of, or intervention of, any DIRECTOR or OFFICER."[5] Even taken in the light most favorable to Strange, it is beyond cavil that Rubin, who was

---

4. Strange cites *Bernstein v. Genesis Ins. Co.,* 90 F.Supp.2d 932 (N.D.Ill.2000), *opinion supplemented,* 2001 WL 812200 (N.D.Ill.2001), *aff'd and remanded,* 28 Fed.Appx. 560 (7th Cir.2002), to bolster his argument. *Bernstein* also dealt with a claims-made policy, and as Judge Andersen correctly observed, in such a policy "coverage is determined based on when the claim was filed, not when the underlying actions leading to the claim occurred." *Id.* at 937. *Bernstein,* however, is distinguishable. First, and most importantly, the plaintiffs in that case's underlying lawsuit (described in the case as the *Turner* suit) were former security holders by the time the claim was made. *See id.* at 934, 937. In the instant case, Imprimis was still a security holder

when the claim was made. Second, the *Turner* suit was brought during the term of the policy at issue in *Bernstein. See generally id.* at 934–36. Judge Andersen even issued his ruling in the *Bernstein* suit itself on March 16, 2000, which was prior to the last day of the policy term. In the instant case, by contrast, the Underlying Litigation was brought well after the last day of the policy term.

5. The policy defines "directors" and "officers" as including "all persons who were, now are, or shall be duly elected Directors or duly elected or appointed Officers." Policy § II.C, as amended by Endorsement Form GIC–7425.A, Mar. 24, 1998.

appointed to FNEDC's board of directors in July 1997, assisted and participated in the Underlying Litigation at the level contemplated by the exclusion.

It is undisputed that Rubin testified as Imprimis's deposition witness under Fed. R.Civ.P. 30(b)(6) for four days in the Underlying Litigation. Genesis's SOF ¶ 51. Nor is it disputed that Rubin was represented by Imprimis's counsel at his depositions in the Underlying Litigation and believed that his discussions with Imprimis's counsel were privileged attorney-client communications. *Id.* ¶ 52. Moreover, although Rubin testified at his deposition in the instant case that he did not have a role in filing the Underlying Litigation and could not recall whether he had reviewed any draft complaints or had provided any input on the complaint or its allegations, he also testified that he spoke with Imprimis's counsel in the Underlying Litigation "often, [on] numerous occasions." Rubin Dep. 18:25–20:1, Feb. 9, 2007. At the request of Imprimis's counsel, Rubin provided "some" input on four responses to interrogatories propounded to Imprimis. *Id.* at 20:2–4; *see id.* at 21:2–25:6. Rubin worked with Imprimis's counsel in formulating his interrogatory responses; for example, he recalled that he may have made comments on some drafts, and he signed the responses, verifying these interrogatories on the companies' behalf. *Id.* at 21:2–25:16; *see* Strange Dep. Ex. 14, Feb. 8, 2007; Rubin Dep. Exs. 2–4. Rubin discussed case strategy with attorneys involved in the case a "[c]ouple times a year." Rubin Dep. 26:20–27:2. He provided input on what allegations he thought were true and on witnesses he thought would have certain knowledge that would be helpful to the case. *Id.* at 27:3–9, 39:7–19. Rubin testified that, of the people at Imprimis, he had the second-greatest level of interaction with Imprimis's lawyers with respect to the litigation. *See id.* at 27:14–21.

The exception clause to the exclusion applies to claims brought "*totally* without the solicitation of, or assistance of, or active participation of" directors and officers, including former directors and officers. (emphasis added) Given the extent of Rubin's participation in the Underlying Litigation, as described above, there is no question that the exception does not apply here. *Cf. Denari v. Genesis Ins. Co.,* 2003 WL 22964371, at *7 (N.D.Ill.2003) (rejecting the plaintiff's "attempt[ ] to downplay the significance of [the] assistance"). As a result, the full force and effect of the exclusion applies.

### D.

▆▆ Strange also has brought a claim for relief under Mass. Gen. Laws ch. 93A, alleging bad-faith claim settlement practices by Genesis. He alleges that Genesis acted in bad faith by, "among other things, unreasonably interpreting and misconstruing pertinent coverage provisions in the Policy and deliberately disregarding facts and circumstances relevant to Strange's claim under the referenced policy." Compl. ¶ 20. The foregoing discussion regarding coverage under the Policy renders this claim a failing one. But even if I had decided the coverage question in favor of Strange, the claim under Chapter 93, would not succeed. There is no evidence of bad faith by Genesis in the record; Genesis simply took the plausible position that the Policy does not cover the claim made by Strange. "An insurance company which, in good faith, denies a claim of coverage on the basis of a plausible interpretation of its insurance policy cannot ordinarily be said to have committed a violation of G.L. c. 93A." *Lumbermens Mut. Cas. Co. v. Offices Unlimited, Inc.,* 419 Mass. 462, 468, 645 N.E.2d 1165

(1995). When, as here, the insurance company "went beyond a mere plausible interpretation of the policy and denied coverage based on a legally correct interpretation of the policy[,] ... there are no facts that support a claim that [the company] acted unfairly or deceptively." *Id.*

### E.

In summary, coverage of Strange's defense costs for the Underlying Litigation is precluded by the insured versus insured exclusion. Accordingly, Genesis's motion for summary judgment as to both counts of Strange's complaint is granted. Strange's cross-motion for summary judgment as to count I of the Complaint is therefore denied.

### II

In its counterclaim against Strange, Genesis asserts three claims. The first count is for declaratory relief. Specifically, Genesis seeks a declaration that the exclusion bars coverage of the defense costs Strange incurred in the Underlying Litigation. Countercl. ¶¶ 32–33. For the reasons stated above, Genesis's motion for summary judgment is granted as to count I of the counterclaim.

Genesis's second claim is for breach of contract. Genesis alleges that "Section VI.B of the Policy requires Strange to repay to Genesis Costs of Defense advanced on his behalf in the event that Genesis has no liability under the Policy." *Id.* ¶ 35.[6] Its third claim is for specific performance.

Genesis contends that Strange executed an undertaking pursuant to which he "agreed 'to repay to Genesis all amounts that [Genesis] advanced for Cost of Defense under the Policy on the undersigned's behalf, in the event that Genesis has no ultimate liability under the Policy.'" *Id.* ¶ 38. Genesis claims that because the exclusion bars coverage, Strange was not entitled to the payment of any defense costs and is obligated to repay Genesis, and that I should order Strange to do so. *Id.* ¶¶ 39–40.

Demand, however, is a condition precedent to Strange's obligation to repay Genesis. The undertaking signed by Strange states the following:

> Pursuant to Policy Section VI.B.3(a)., the undersigned undertakes, *upon demand by Genesis,* to repay to Genesis all amounts that [sic.] advanced for Cost of Defense under the Policy on the undersigned's behalf, in the event that Genesis has no ultimate liability under the Policy with respect to such Costs of Defense to the Directors or Officers....

Undertaking ¶ 5, Def.'s Ex. H (emphasis added). There is no evidence before me concerning whether such a demand has been made.[7] Thus, it is far from clear that

---

**6.** The amount in question here is $53,081.43, the costs of defense that Genesis advanced on Strange's behalf in the Underlying Litigation before ceasing its payments. Genesis's SOF ¶ 42 (citing Zartman Decl. ¶ 3, Def.'s Ex. I).

**7.** The letter Genesis sent to Strange's counsel upon learning about Rubin's interrogatory responses on behalf of Imprimis only states that "Genesis shall cease advancing Costs of Defense on Mr. Strange's behalf incurred after today's date." Pl.'s Ex. 10, at 2. Nowhere does it demand that Strange repay what he already was advanced. Similarly, the Declaration of Michael B. Zartman, which is attached to Genesis's motion, concerns the amount Genesis advanced to Strange but nowhere mentions that Genesis has ever demanded that Strange pay back the money. *See* Zartman Decl., Def.'s Ex. I.

I also observe that Genesis has not alleged in its counterclaim that it has made such a demand. It only alleges that "Strange was not entitled to the payment of any Cost of Defense and is obligated to repay to Genesis" such amounts. Countercl. ¶ 36. There is no

Strange, by apparently not paying Genesis the $53,081.43 as of this date, has breached his contract with Genesis.

Accordingly, Genesis's motion for summary judgment on counts II and III of its counterclaim is denied. On the other hand, this memorandum and order delineates the rights of the parties, and I expect that, with this guidance, the parties should resolve any dispute that remains. *See Quinn v. Mar–Lees Seafood, LLC,* 69 Mass.App.Ct. 688, 707, 871 N.E.2d 511 (2007) ("With the rights of the parties under the agreement now clearly established, we have no basis for concluding that [the defendant] will not fulfill its contractual obligation. A judgment of specific performance adds nothing. . . ."). Strange's cross-motion seeks dismissal of the counterclaim. Strange's Mem. in Opp'n. 20. For the reasons stated in the preceding paragraph, counts II and III of the counterclaim are accordingly dismissed.

### III

In summary, Genesis's motion for summary judgment as to counts I and II of Strange's complaint is granted. Strange's motion for summary judgment on count I of his complaint is denied. Genesis's motion for summary judgment on its counterclaim is granted as to count I and denied as to counts II and III. Counts II and III of Genesis's counterclaim are dismissed without prejudice. The clerk shall set this matter for a status conference within sixty days of the date of this memorandum and order.

So ordered.

evidence of record that the condition prece- dent—a demand—has been met.