### DEMERS BROS. TRUCKING, INC. and Mossberg Realty Corporation, Plaintiffs,

v.

### CERTAIN UNDERWRITERS AT LLOYD'S, LONDON, SUBSCRIBING TO CERTIFICATE NUMBER SRS IM MA 04–124, Defendant.

Civil Action No. 07–10902–JLT.

United States District Court, D. Massachusetts.

March 3, 2009.

---

James E. Grumbach, Grumbach & Royal, LLC, Wellesley, MA, William J. Royal, Jr., for Plaintiffs.

Mindy M. Medley, Sava A. Vojcanin, Clausen Miller PC, Chicago, IL, Stephen C. Reilly, Amber Anderson Villa, Sally & Fitch LLP, Boston, MA, for Defendant.

## MEMORANDUM

TAURO, District Judge.

### I. Introduction

Plaintiffs Demers Bros. Trucking, Inc. ("Demers") and Mossberg Realty Corporation ("Mossberg") bring this action against Defendant Certain Underwriters at Lloyd's, London, Subscribing to Certificate Number SRS IM MA 04–124 ("the Insurer") to enforce an inland marine insurance policy. This action arose out of an insurance coverage dispute resulting from a March 2005 fire at Plaintiffs' Dodgeville Mill. Plaintiffs assert claims for (1) breach of contract; (2) declaratory judgment; and (3) violation of the Massachusetts Consumer Protection law. Presently at issue are Parties' cross-motions for summary judgment.[1] For the following reasons, Defendant's *Motion for Summary Judgment* is ALLOWED IN PART and DENIED IN PART, and Plaintiffs' *Motion for Partial Summary Judgment* is ALLOWED IN PART and DENIED IN PART.

### II. Background

At all times relevant to this action, Demers operated a rigging and heavy-hauling business at the historic Dodgeville Mill ("the Building") in Attleboro, Massachusetts. Demers leased space at the Building from Mossberg, a realty corporation and owner of the Building. The Insurer issued insurance policy Certificate Number SRS IM MA 04–124 ("the Policy"), effective October 31, 2004 through October 31, 2005, to Demers and Mossberg (collectively "the Insured").[2]

During the Policy period, two separate fires broke out at the Building: one on March 24, 2005 and the other in July 2005. The cause and origin of both fires were categorized as "suspicious," and a Demers employee was arrested for starting the second fire. The Insured informed the Insurer of the March fire and the loss that it had caused. Because the Insured did not claim any damages for the July fire, this dispute focuses on the March fire ("the Fire").[3]

The Fire occurred in an upper floor of the Building and caused significant dam-

---

**1.** In addition, Defendant has filed a *Motion to Strike Portions of Christopher Attles' Affidavit and the Attendant Additional Material Facts*. Because this court reaches its decision without relying on the challenged portions of Mr. Attles's affidavit, this Motion is DENIED AS MOOT.

**2.** The premium allocation under the Policy was approximately 87% for Demers and 13%

for Mossberg. Though certain claims under the Policy may pertain to one of the Insured and not the other, referring to Demers and Mossberg collectively as "the Insured" will aid in convenience and suffice for summary judgment purposes.

**3.** The Insurer ultimately relinquished its arson defense to the Fire.

age, including: (1) a one-hundred-by-forty-two-foot hole through the roof; (2) destruction of over eighty windows; (3) damage to the timber framing, roof, walls, and first-wing floor decking; and (4) smoke damage to the third floor. In addition, the Fire activated approximately eighty automatic sprinkler heads. Finally, the Attleboro Fire Department spent approximately four hours applying water to the Fire and various "hot spots" throughout the Building, and punctured additional holes through the roof.

The Insured enlisted Professional Loss Adjusters ("PLA"), a public adjusting firm, to present insurance claims arising from the Fire to the Insurer. Brian Payne, a PLA employee, served as the primary adjuster on the Insured's behalf. Leonard Theran, also a PLA employee, oversaw Mr. Payne's work. Christopher Attles, Demers's vice president, served as the primary contact between PLA and the Insured. Paul Dowling, of McLarens Young International ("McLarens"), served as the Insurer's independent insurance adjuster.

On February 22, 2006, Mr. Payne (for the Insured) sent Mr. Dowling (for the Insurer) a letter that enclosed two Sworn Statements in Proof of Loss. The first was for $518,915.05 in property damage, and the second was for $200,000 in claims related to (1) cargo and transportation and (2) loss of income, rents, and extra expenses. On March 14, 2006, Mr. Dowling informed Mr. Payne that the Insurer approved the $518,915.05 payment but rejected the $200,000 payment. By approximately March 24, 2006, the Insured had received the $518,915.05 from the Insurer.

On July 17, 2006, the Insured submitted a claim package to Mr. Dowling. This package included a Sworn Statement in Proof of Loss of $242,171.84 to reimburse

Insurance Reconstruction Services ("IRS") for its efforts in repairing, drying, and protecting the Building. Sometime after July 17, 2006, the Insurer paid the Insured the $242,171.84. On August 17, 2006, Mr. Dowling sent Mr. Payne a letter inviting him to discuss the July 17 claim package, and in October 2006, Mr. Dowling and Messrs. Payne and Theran met to discuss the Insured's claim.

On December 29, 2006, the Insured submitted a "final submission . . . to settle the subject claim."[4] The Insured's December 29 submission sought coverage for the following: (1) eight line-items under the Real and Personal Property provision; (2) eleven line-items under the heading "Loss of Income/Rents/Extra Expense"; (3) one line-item under the Cargo and Transportation provision; and (4) one line-item under the Riggers Liability provision. On January 16, 2007, Mr. Dowling corresponded with Mr. Payne regarding the December 29 submission and requested that Mr. Attles undergo an Examination Under Oath ("EUO").

Mr. Attles underwent an EUO on March 7, 2007. Approximately two months later, the Insurer received additional documentation that it had requested from the Insured. After receiving this information, the Insurer paid the Insured an additional $253,913.16. To this date, the Insurer has paid the Insured $1,017,500 under the Real and Personal Property provision.

The Insured brought this action in Massachusetts Superior Court on April 11, 2007. The Insurer removed to this court on May 14, 2007. The Insured seek actual, along with double or treble, damages; interest and costs; and a declaration of Parties' rights and obligations under the Policy. On May 2, 2008, the Insurer moved for summary judgment on all counts of the Insured's Second Amended

---

4. Def.'s Mem. Supp. Summ. J. Ex. 21, Dec. 29 Submission 1.

Complaint. On June 2, 2008, the Insured moved for full summary judgment on liability and partial summary judgment on damages that are readily ascertainable or not subject to genuine dispute.

## III. Discussion

### A. Legal Standard for Summary Judgment

A court may grant summary judgment when the moving party has shown "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." [5] The opposing party has the burden of production to "set forth specific facts showing that there is a genuine issue for trial." [6] Neither party, however, "may rely on conclusory allegations or unsubstantiated denials, but must identify specific facts derived from the pleadings, depositions, answers to interrogatories, admissions, and affidavits to demonstrate either the existence or absence of an issue of fact." [7]

### B. Counts I and II: Breach of Insurance Contract and Declaratory Judgment

#### 1. Legal Standard for Insurance Coverage Claims

According to Massachusetts law, "insurance-contract interpretations pose legal issues for resolution by the court." [8] The initial burden of proof rests with the insured to prove "that the loss is within the description of the risks covered." [9] After the insured establishes that a claim falls within the coverage terms, the burden shifts to the insurer to demonstrate whether any exclusion applies.[10] Insurance coverage exclusions are strictly construed.[11]

Courts must enforce insurance contracts according to their plain language, unless that language is ambiguous.[12] A contract term is ambiguous if "its language is 'reasonably prone to different interpretations' or 'susceptible to differing, but nonetheless plausible, constructions.'" [13] The court is to interpret an insurance contract "according to the fair and reasonable meaning of the words in which the agreement of the parties is expressed," [14] construing the insurance contract terms "in their usual and ordinary sense" and "in the context of the Policy as a whole." [15] The court must resolve any contract ambiguity against the insurer.[16]

In this case, for the Insured's claims that do not present a genuine issue of material fact, the relevant inquiry solely involves the terms of the Policy and is therefore a question of law for this court to resolve.[17]

5. Fed.R.Civ.P. 56(c).

6. Id. 56(e).

7. Magee v. United States, 121 F.3d 1, 3 (1st Cir.1997).

8. Utica Mut. Ins. Co. v. Weathermark Invs., Inc., 292 F.3d 77, 80 (1st Cir.2002).

9. John Beaudette, Inc. v. Sentry Ins. A Mut. Co., 94 F.Supp.2d 77, 134 (D.Mass.1999) (quotations and citations omitted).

10. Id.

11. Id.

12. Utica Mut. Ins. Co., 292 F.3d at 80.

13. Lanier Prof'l Servs., Inc. v. Ricci, 192 F.3d 1, 4 (1st Cir.1999) (quoting Alison H. v. Byard, 163 F.3d 2, 6 (1st Cir.1998)).

14. Allmerica Fin. Corp. v. Certain Underwriters, 449 Mass. 621, 871 N.E.2d 418, 425 (2007) (quotation and citations omitted).

15. Strange v. Genesis Ins. Co., 536 F.Supp.2d 71, 74 (D.Mass.2008) (quotation and citation omitted).

16. Utica Mut. Ins. Co., 292 F.3d at 80.

17. See id.

### 2. Plaintiffs' Insurance Coverage Claims

■ The Insurer has already paid the Insured $1,017,500 under the Real and Personal Property provision of the Policy, which the Insurer claims exhausts the Real and Personal Property sublimit.[18] Consequently, the Insured argue that (1) certain claims that the Insurer allocated under the Real and Personal Property provision could have been allocated under Policy provisions whose sublimits have not been exceeded, and (2) they have additional claims that fall under Policy provisions whose sublimits have not been exceeded.

At issue in this case are the Insured's insurance claims, listed in their December 29 submission, seeking coverage for the following items: (1) spools of superconductive cables belonging to the Massachusetts Institute of Technology ("MIT cables"); (2) switchgears belonging to Stern–Leach ("switchgears"); (3) IRS's invoiced work ("IRS invoice"); (4) security guard service and security system; (5) various repair expenses; (6) lost rental space and labor to relocate; and (7) loss of rent.[19] Also at issue are the Insured's claims for (1) contractors' equipment and (2) supplemental personal property, rigging equipment, and Mossberg personal property. Finally, the Insured seek (1) reimbursement of the $2,500 deductible, (2) statutory interest, and (3) consequential damages.[20]

The Insured's claims implicate the Real and Personal Property, Contractors Equipment, Riggers Liability, and Cargo and Transportation Policy provisions. These provisions provide the following coverage:

1. *REAL AND PERSONAL PROPERTY*—All real and personal property (including improvements and betterments) of this Insured, against risks of direct physical "loss" or damage occurring during the period of this policy per the schedule(s) of values on file with Underwriters, or attached to this policy. Coverage is extended to Newly Acquired Property to the extent of the limit shown on the Individual Lines Sub–Limits of Liability Declarations Page provided that Underwriters is [sic] are notified within 60 days of acquisition.

2. *CONTRACTORS EQUIPMENT*—Contractors Equipment or Mobile Equipment of the Insured, or similar equipment of Others in the Insured's care, custody and control, for which the Insured may be held liable, per Schedule on file with Underwriters, against risk of direct physical "loss" or damage from an external cause. Coverage is further extended to cover newly acquired owned equipment, provided that Underwriters are notified within 60 days of acquisition, and to non-scheduled equipment leased, rented or borrowed from others, where the Insured may be held liable.

3. *RIGGERS LIABILITY*—The liability of the Insured as a bailee for direct physical "loss" or damage to the property of others in the care, custody and control of the Insured for rigging and/or hoisting, loading and unloading, dismantling or erec-

---

**18.** The Real and Personal Property sublimit is $1,020,000, and the Policy includes a $2,500 "per 'Occurrence' " deductible. *See* Def.'s Mem. Supp. Summ. J. Ex. 1, Policy 16–17. The Insured argue that the Insurer improperly deducted $2,500 from the $1,020,000 Real and Personal Property sublimit. *See infra* subsection III.B.2.g. (discussing the Insured's $2,500 deductible claim).

**19.** *See* Dec. 29 Submission 13–20.

**20.** The Insured also seek a finding that the Insurer engaged in unfair claim settlement practices.

tion, moving, or storage away from the work location (no storage receipt).

. . .

5. *CARGO AND TRANSPORTA-TION*—The liability of the Insured for direct physical "loss" or damage, either legally or contractually, to the property of others while being moved under bills of lading, work orders, shipping receipts, delivery receipts, or other contractual documents, while in the possession of the Insured or connecting carrier, and while stored in transit, not to exceed thirty (30) days.[21]

The Policy does not provide coverage for warehousemen liability.[22]

The Insured's claims also involve the Extra Expense provision of the Time Element Endorsement. The Extra Expense provision provides the following coverage:

This policy will pay necessary "Extra Expense" that is incurred due to direct physical "loss" to Real and Personal Property to which coverage applies under this policy, as a result of a covered "Cause of Loss." This policy will also pay "Extra Expense" that will serve to minimize the suspension of business and to continue operations, or to minimize the suspension of business if operations cannot be continued.

"Extra Expense" means the necessary expenses that are incurred during the "period of restoration" that would not have been incurred if there had been no direct physical "loss" to the Insured's Real and Personal Property which is covered under this policy.[23]

a. *MIT Cables*

Prior to the Fire, Demers contracted with MIT to transport twenty-nine spools of superconductive cables from California to Massachusetts. The MIT cables arrived at the Building on March 18, 2005, and shortly thereafter Demers transported two of the twenty-nine spools to MIT's facilities. The remaining twenty-seven spools were inside the Building at the time of the Fire. As a result of the Fire, the MIT cables suffered "cosmetic," "superficial" damage.[24] MIT has not made a claim against Demers. The Insured seek coverage in the amount of $30,132 for the "inspection and testing" of the MIT cables.[25]

 Though the Insured assert that both the Cargo and Transportation and the Riggers Liability provisions provide coverage for their claim, these provisions cover "direct physical 'loss' or damage" to property in the Insured's care. The MIT cables would likely not satisfy this language because they only suffered "cosmetic" damage. Instead, the Insured's right to recover would lie at common law. The common law imposes a duty on insured parties to mitigate insured loss.[26] Absent an insurance policy provision to the contrary, the common law also recognizes the right of the insured to seek compensation from the insurer for the costs of mitigation.[27] To be entitled to compensation, the

21. Policy 7.

22. *See id.* at 16.

23. *Id.* at 29–30.

24. Def.'s Mem. Supp. Summ. J. Ex. 2, Attles EUO 57:16–58:3, Mar. 7, 2007.

25. *Id.* at 59:8–59:10.

26. 11 Lee R. Russ, *Couch on Insurance* § 168:11 (3d ed. 2008).

27. *Id.* (citing *Am. Home Assurance Co. v. J.F. Shea Co., Inc.,* 445 F.Supp. 365 (D.D.C.1978); *Witcher Constr. Co. v. Saint Paul Fire & Marine Ins. Co.,* 550 N.W.2d 1 (Minn.Ct.App. 1996); *Metalmasters of Minneapolis, Inc. v. Liberty Mut. Ins. Co.,* 461 N.W.2d 496 (Minn. Ct.App.1990); *City Coal & Supply Co. v. Am. Auto. Ins. Co.,* 99 Ohio App. 368, 133 N.E.2d 415 (1954); *Travelers Indem. Co. v. Pollard Friendly Ford Co.,* 512 S.W.2d 375 (Tex.Civ. App.1974)).

insured must show that the mitigation expenses relate to an existing or imminent covered loss.[28]

Here, the Insured's costs in transporting, relocating, unwrapping, and inspecting the MIT cables are recoverable from the Insurer as mitigation expenses. The Insured had a duty to mitigate damage to the MIT cables that could have resulted from the Fire suppression efforts and the excessive moisture in the Building. The Insured's expenses, such as "uncrat[ing], unwrap[ping,] photograph[ing], rewrap[ping] and re-crat[ing]"; "temporarily relocat[ing]"; "prepar[ing] a more appropriate location"; "relocat[ing] to an entirely different facility" "after the next heavy rain storm"; and "unwinding, inspect[ing] and rewind[ing]," [29] were all reasonably related to mitigating damage to the MIT cables. That the MIT cables only suffered "cosmetic" damage is evidence of the success of the Insured's mitigation efforts, not an indictment of their validity.

■ The Insured's mitigation expenses were related to an imminent covered loss under the Cargo and Transportation provision. The Insurer argues that the Cargo and Transportation provision would not cover damage to items in the Insured's possession for more than "thirty (30) days." [30] Though the Insured retained possession of the MIT cables for more than thirty days after the Fire, the MIT cables had been in the Insured's possession for fewer than thirty days at the time of the Fire. The Policy is ambiguous as to whether the Cargo and Transportation provision would cover loss to property that

had been in the Insured's possession for fewer than thirty days at the time of loss but for more than thirty days after the loss. Construing this ambiguity against the Insurer,[31] this court finds that the Cargo and Transportation provision would have covered any material damage that the Fire and related suppression efforts caused the MIT cables. The Insured, therefore, are entitled to recover the $30,132 in costs they incurred in mitigating damage to the MIT cables because they related to an imminent loss that the Cargo and Transportation provision would have covered.

Accordingly, Defendant's Motion is DENIED and Plaintiffs' Motion is ALLOWED with respect to Plaintiffs' MIT cables claim.

b. *Switchgears*

At the time of the Fire, switchgears owned by a Demers customer, Stern–Leach, were inside the Building allegedly as "part of a rigging operation that [Demers was] hired to do." [32] The Fire suppression efforts damaged a number of the switchgears. Consequently, the Insured seek coverage in the amount of $77,369.71 for repairs to the switchgears.

■ The Insured contend that the Riggers Liability provision covers the switchgears. Though the switchgears were not literally being rigged when they suffered damage, the Riggers Liability provision could apply in this situation because it covers property in the "control of the Insured for ... storage away from the work location (no storage receipt)." [33] The Insurer argues that the Riggers Liability

28. *Id.*

29. Dec. 29 Submission 19.

30. Policy 6 ("The liability of the Insured for direct physical 'loss' or damage, either legally or contractually, to the property of others while being moved under bills of lading, work orders, shipping receipts, delivery receipts, or other contractual documents, while in the possession of the Insured or connecting carrier, and while stored in transit, *not to exceed thirty (30) days."* (emphasis added)).

31. *See Utica Mut. Ins. Co.,* 292 F.3d at 80.

32. Attles EUO 93:7–93:8.

33. Policy 6.

provision excludes coverage in this case because there is evidence of storage receipts for the switchgears. First, Ronald Dubuc, a Stern–Leach employee, agreed that "Demers Brothers does not insure Stern–Leach's equipment ... for long-term storage" and testified that Stern–Leach receives "a monthly invoice and occasionally ... a list of what material is stored [at the Building]."[34] Second, the document entitled "Stern–Leach #11" lists two switchgears that were present at the Building as of November 8, 2004 and includes a monthly billing amount of $554.[35]

■ Because the Policy does not define "storage receipts," this court must interpret the term in its "usual and ordinary sense" and "in the context of the Policy as a whole."[36] Here, the Insured ask this court to construe the term "storage receipts" as a "warehouse receipt." *Black's Law Dictionary* defines "warehouse receipt" as "[a] document evidencing title to goods stored with someone else; esp., a receipt issued by a person engaged in the business of storing goods for a fee."[37] The Stern–Leach #11 document satisfies this definition. It lists (1) the fee that Demers charged Stern–Leach; (2) a description of each Stern–Leach property item located in the Building; (3) the date on which each item arrived; (4) an invoice number for each item; (5) the number of square feet that each item occupied; and (6) the location of each item within the Building.[38] In addition, Stern–Leach's own employee corroborated the presence of "storage receipts," stating that Stern–Leach occasionally would receive "a list of what material is stored."[39] Finally, construing the Stern–Leach #11 document as a "storage receipt" is consistent with the Policy as a whole, which excludes coverage for warehousemen liability[40] and, in the Cargo and Transportation provision, excludes coverage for items in the Insured's possession for more than thirty days.[41] The Stern–Leach #11 document indicates that the two listed switchgears were present at the Building as of November 8, 2004, more than thirty days before the March 24, 2005 Fire.[42] This court finds, therefore, that the Stern–Leach #11 document is a "storage receipt" for purposes of the Riggers Liability provision.

■ The Insured assert, though, that there is no evidence demonstrating that any of the damaged switchgears were the two switchgears listed in the Stern–Leach #11 document. According to the Insured, "at least twelve (12) separate Stern–Leach switchgears" were "involved in [the] rigging operation."[43] The Insured have also

---

**34.** Def.'s Mem. Supp. Summ. J. Ex. 27, Dubuc Dep. 10:12–10:21, Oct. 15, 2007.

**35.** *See id.* Ex. 30, Stern–Leach #11 at 1.

**36.** *Strange,* 536 F.Supp.2d at 74.

**37.** *Black's Law Dictionary* 1615 (8th ed. 2004); *see also In re Equity Funding Corp. of Am. Sec. Litig.,* 375 F.Supp. 1378, 1390–91 (J.P.M.L.1974) (defining "warehouse receipts" as "receipts from ... a warehouse showing that specified goods have been delivered to it").

**38.** Stern–Leach #11 at 1.

**39.** Dubuc Dep. 10:20–10:21.

**40.** *See* Policy 6 ("*WAREHOUSEMAN LIABILITY*—The liability of the Insured as a bailee for direct physical 'loss' or damage to the property of others in the care, custody and control of the Insured for which a *storage receipt* has been issued while the Insured is acting as a Warehouseman." (second emphasis added)).

**41.** *Id.*

**42.** Stern–Leach #11 at 1.

**43.** Pls.' Mem. Resp. Feb. 13, 2009 Order 4; *see also* Attles Aff. 4, June 2, 2008 ("Among the property damaged in the Fire were two (2) of the approximately twelve (12) swit-

produced an invoice purporting to list all the switchgears that were in the Building at the time of the Fire and those switchgears that sustained damaged.[44] The invoice appears to list twelve total switchgears, of which five sustained "Cost Material" damage.[45] The invoice does not indicate, however, whether any of the damaged switchgears were the switchgears listed in the Stern–Leach # 11 document.[46] As the evidence demonstrates, there is a genuine issue of material fact as to whether any of the damaged switchgears were the switchgears listed in the Stern–Leach # 11 document and therefore excluded from coverage.

Accordingly, Defendant's Motion is DENIED and Plaintiffs' Motion is DENIED with respect to Plaintiffs' switchgears claim.

### c. *IRS Invoice*

■ IRS, Demers's emergency repair and remediation contractor, removed standing water from the Building, dried the Building, enclosed the roof, boarded windows, and provided other emergency repairs.[47] The Insurer has reimbursed the Insured for the $242,171.84 IRS invoice under the Real and Personal Property provision. The Insured now claim that the $242,171.84 IRS invoice can be divided under five different provisions: (1) Real and Personal Property; (2) Contractors Equipment; (3) Riggers Liability; (4) Cargo and

Transportation; and (5) the Time Element Endorsement.[48] The Insured raise this argument because splitting the IRS invoice between other Policy provisions would create room for additional coverage under the already-exhausted Real and Personal Property sublimit.

The IRS invoice is broadly divided into two parts: (1) "Water Out" services to remove standing water and dry the Building; and (2) emergency electrical work and services to protect the Building from further water inundation and damage.[49] The water removal and drying services amounted to a total cost of $153,436.50.[50] The emergency electrical work and services to protect the Building from further water inundation amounted to a total cost of $88,735.34.[51]

■ Here, the $153,436.50 in water removal and drying costs falls under the Real and Personal Property provision. The Extra Expense provision of the Time Element Endorsement covers "the necessary expenses that are incurred during the 'period of restoration' that would not have been incurred if there had been no direct physical 'loss' to the Insured's Real and Personal Property which is covered under this policy."[52] IRS's water removal and drying services were a direct response to the damage that the Fire and the resultant suppression efforts caused to the Building. These services were direct-

chgear units, which Demers had received as part of a rigging operation for a long-time customer, Stern–Leach Corporation.... "[T]he first of the switchgears arrived in November 2004 and the last arrived in late February or early March 2005.").

44. *See* Grumbach Aff. Ex. G, Square D Invoice 2–3, Apr. 18, 2005; *cf.* Dubuc Dep. 22:17–22:19 (testifying that the "switch gear type equipment" "was itemized" on the Square D invoice).

45. Square D Invoice 2–3.

46. *See id.*

47. *See* Def.'s Mem. Supp. Summ. J. Ex. 33, IRS Invoice 2. 14

48. *See* Pls.' Mem. Supp. Summ. J. 12.

49. *See* Dec. 29 Submission 29 (enclosing the IRS "STATEMENT").

50. *Id.* at 30.

51. *Id.*

52. Policy 29.

ed toward protecting the Insured's property "against risks of direct physical 'loss' or damage" and clearly falls under the Real and Personal Property provision.[53] Water removal and drying services were a necessary element of the reconstruction process, and emergency reconstruction services generally fall under the primary insurance provision (here, the Real and Personal Property provision), not any extra expense provision.[54] In drafting the Extra Expense provision in this case, the Insured and Insurer may have contemplated such costs as those necessary to rent extra space or hire extra security in the event of a fire at the Building.[55] But it would be unreasonable to assume that the Insured and Insurer contemplated that the Extra Expense provision would cover services to remove and dry water that resulted from fire suppression efforts, costs directly related to the restoration itself.[56]

 Moreover, the Insured have not met their burden of proving that the $153,436.50 in water removal and drying costs falls under the Contractors Equipment, Riggers Liability, or Cargo and Transportation provisions. The Insured have made only conclusory allegations as to the applicability of these provisions. The Insured have not alleged any particularized facts demonstrating which property was damaged, which property was at risk of being damaged, or the Policy provisions under which that property would be covered.[57]

 Finally, applying the $153,436.50 in water removal and drying costs to any provision other than the Real and Personal Property provision would lead to the forbidden, absurd result of rendering the Real and Personal Property provision superfluous. When scrutinizing a contract, a court should interpret broad contract language so as to avoid absurd results.[58] Massachusetts law disfavors "contract interpretations that make some provision of the contract 'useless or inexplicable.' "[59] In the context of an insurance contract, reconstruction expenditures generally are related to the primary coverage of an insurance policy, not any extra expense provisions.[60]

Allocating the water removal and drying costs under the Contractors Equipment, Riggers Liability, Cargo and Transportation, and Extra Expense provisions, without a particularized showing of their applicability, would provide an end-run around the Real and Personal Property sublimit. If the Insured could bypass the Real and Personal Property sublimit by generally

53. *Id.* at 6.

54. *See Thompson v. Threshermen's Mut. Ins. Co.*, 172 Wis.2d 275, 493 N.W.2d 734, 737 (Wis.Ct.App.1992).

55. *Cf. infra* subsections III.B.2.d.i. and III. B.2.d.iii. (discussing the Insured's (1) security guard service and security system and (2) lost rental space and labor to relocate claims).

56. *See Thompson*, 493 N.W.2d at 737.

57. *See Magee*, 121 F.3d at 3 ("Neither party may rely on conclusory allegations or unsubstantiated denials, but must identify specific facts derived from the pleadings, depositions, answers to interrogatories, admissions and affidavits to demonstrate either the existence or absence of an issue of fact.").

58. *In re Babcock Borsig AG*, 583 F.Supp.2d 233, 237 (D.Mass.2008).

59. *Spence v. Berkshire Life Ins. Co.*, 561 F.Supp.2d 126, 129 (D.Mass.2008) (quoting *Worcester Mut. Ins. Co. v. Marnell*, 398 Mass. 240, 496 N.E.2d 158, 161 (1986)).

60. *See, e.g., Thompson*, 493 N.W.2d at 737 (holding that a lessee could not use an extra expense insurance provision to cover the costs to rebuild a rented store because neither party contemplated this use when signing the policy).

claiming that unspecified property is covered by another provision, the Real and Personal Property sublimit would be rendered useless.[61] Adopting the Insured's argument would allow future similarly situated insured parties to get out from underneath the sublimit of the primary insurance provision by arguing, without specific factual support, that any large-scale damage to a building simply must have affected the property located therein.

The $88,735.34 in expenses related to protecting the Building from further water inundation and damage, however, does fall under the Extra Expense provision. These expenses included (1) "[c]over[ing] roof over holiday weekend"; (2) "[b]oard[ing]-up windows with plastic sheathing"; (3) "[p]arachut[ing] ceiling with plastic"; (4) "[b]uild[ing] retaining pool to catch rain water"; and (5) "[e]mergency/temporary electric services."[62] Though these expenses would fall under the Real and Personal Property provision, they were also necessary to mitigate further damage to the Building and would fall within the Extra Expense provision. Protecting the Building from further water inundation through the roof, windows, and floor, and providing emergency electrical services were all necessary " 'Extra Expense' that . . . serve[d] to minimize the suspension of business and to continue operations."[63]

Accordingly, with respect to Plaintiffs' IRS invoice claim, Defendant's Motion is ALLOWED IN PART and DENIED IN PART, and Plaintiffs' Motion is ALLOWED IN PART and DENIED IN PART.

#### d. Time Element Endorsement Claims

In their December 29 submission, the Insured brought several particularized claims under the Time Element Endorsement. Most of the claims pertain to the Extra Expense provision, which covers "the necessary expenses that are incurred during the 'period of restoration' that would not have been incurred if there had been no direct physical 'loss' to the Insured's Real and Personal Property which is covered under this policy."[64] The Insured seek coverage for (1) security guard service and security system (items A and B); (2) various repair expenses (items C–H); (3) lost rental space and labor to relocate (items I and J); and (4) loss of rent (item K).[65]

##### i. Items A and B: Security Guard Service and Security System

The Insured seek coverage in the amount of $77,395.58 for security guard service (item A) and a security system (item B) under the Extra Expense provision. The Insured argue that the security guard service and security system were necessary extra expenses because the exposed condition of the Building required security guards and, eventually, an upgraded security system. The Insurer responds that the security guard service and security system were unnecessary extra

---

61. See Spence, 561 F.Supp.2d at 129; Nassau Gallery, Inc. v. Nationwide Mut. Fire Ins. Co., No. Civ.A. 00C–05–034, 2003 WL 21223843, at *3 (Del.Super.Ct. Apr. 17, 2003) ("[Defendant] is not responsible for [Plaintiff's] failure to obtain adequate insurance coverage nor for those losses exceeding the Policy's primary coverage limit, including reconstruction expenses related to carpet, lighting, paint, and drywall. Thus, [Plaintiff's] reconstruction expenditures are not compensable Extra Expen-

ditures. . . . A contrary finding would lead to the forbidden absurd result.").

62. Dec. 29 Submission 29.

63. Policy 29.

64. Id.

65. See Dec. 29 Submission 13–14 (listing items A–K).

expenses because there is no evidence of damage to the old security system, the new security system is an upgrade, and security guards were absent for a period of time after the Fire but prior to the installation of the new security system. As the conflicting evidence demonstrates, there is a genuine issue of material fact as to whether the security guard service and security system were actually "necessary."

Accordingly, Defendant's Motion is DENIED and Plaintiffs' Motion is DENIED with respect to Plaintiffs' security guard service and security system claim.

#### ii. *Items C–H: Various Repair Expenses*

■ The Insured seek coverage in the amount of $42,335.58 for various repair expenses under the Extra Expense provision. The expenses included (1) crane service "to tarp the roof" (item C); (2) "crane, materials, and labor needed to complete the tarping of the building, the blocking of the windows and the tarping of the windows" (items D and E); (3) expenses to "pump out water, divert water and construct a temporary parachute system on the third floor" (item F); (4) "dumpster service as well as labor to remove debris from first, second and third floors" (item G); and (5) "[o]ngoing water services . . . for the 18 months that the roof went unrepaired" (item H).[66] Though these expenses would fall under the Real and Personal Property provision, they were also necessary to mitigate further damage to the Building and would fall within the Extra Expense provision. Protecting the Building from further water inundation

through the roof and windows, pumping out water as it did make its way into the Building during the period of restoration, and clearing debris were all necessary "'Extra Expense' that . . . serve[d] to minimize the suspension of business and to continue operations."[67] The Insured, therefore, are entitled to recover $42,335.58 in various repair expenses.

Accordingly, Defendant's Motion is DENIED and Plaintiffs' Motion is ALLOWED with respect to Plaintiffs' various repair expenses claim.

#### iii. *Items I and J: Lost Rental Space and Labor to Relocate*

■ The Insured seek coverage in the amount of $487,840 for lost rental space (item I) and labor to relocate (item J) under the Extra Expense provision. The Insured argue that the lost rental space and labor to relocate were necessary extra expenses because large areas of the Building were not waterproof until all repairs were completed. The Insurer responds that the lost rental space and labor to relocate were not necessary extra expenses because, before the Fire, Demers had contemplated leasing new storage space and transforming the Building into a museum. The Insured reply that the expenses did not exist prior to the Fire because the lease for the additional space was not signed until after the Fire. As the conflicting evidence demonstrates, there is a genuine issue of material fact as to whether the lost rental space and labor to relocate expenses were actually "necessary."

---

66. *Id.* at 14–16.

67. Policy 29; *see also Charles Dowd Box Co. v. Fireman's Fund Ins. Co.*, 351 Mass. 113, 218 N.E.2d 64, 71 (1966) (upholding damages for business interruption for "temporary electrical services and wiring and temporary roof repairs"); *Travelers Indem. Co.*, 512 S.W.2d at

379–80 ("Cleaning up the debris, preserving the remains of the operation, and making preparations for reopening business would appear to be acts 'in order to continue as nearly as practicable the normal conduct of insured's business.' "). *See supra* subsection III.B.2.c. (discussing the Insured's IRS invoice claim).

Accordingly, Defendant's Motion is DENIED and Plaintiffs' Motion is DENIED with respect to Plaintiffs' lost rental space and labor to relocate claim.

#### iv. *Item K: Loss of Rent*

■ The Insured seek coverage in the amount of $101,712 for loss of rent under the Time Element Endorsement. The Policy covers " 'loss' sustained due to slowdown or suspension of business made necessary due to direct physical 'loss' to Real and Personal Property," [68] but it excludes coverage for "any increase of loss which may be occasioned by the suspension, lapse, or cancellation of any lease, license, contract, or order." [69]

The loss of rent in this case resulted from two former tenants, Mechanology and Creative Sewing, leaving the Building. Mechanology elected not to renew its lease after the Fire,[70] so the resulting loss clearly falls under the "occasioned by the ... lapse ... of any lease" exclusion.[71] That Mechanology decided not to exercise its option to renew is immaterial. Any loss associated with Mechanology leaving the Building was occasioned, in fact, by the lapse of Mechanology's lease. Creative Sewing's lease expired on March 1, 2005,[72] so that loss also falls under the exclusion. Even if the Insured are correct that Creative Sewing entered into a tenancy-at-will following the lapse of its lease, the tenancy-at-will lapsed, too. Given that a tenancy-at-will is a contractual relationship,[73] the lapse of a Creative Sewing tenancy-at-will would clearly fall under the "occasioned by the ... lapse ... of any ... contract" exclusion.[74]

Accordingly, Defendant's Motion is ALLOWED and Plaintiffs' Motion is DENIED with respect to Plaintiffs' loss of rent claim.

#### e. *Contractors' Equipment*

■ In their Motion, Plaintiffs seek, for the first time, coverage under the Contractors Equipment provision for (1) "Demers Bros. Equipment clean and service"; (2) "Equipment Inspection & Inventory"; and (3) "Mossberg Realty Personal Property, Clean/Service." [75] The Contractors Equipment provision covers (1) "Contractors Equipment or Mobile Equipment of the Insured, or similar equipment of Others in the Insured's care, custody and control, for which the Insured may be held liable, *per Schedule on file with Underwriters*"; (2) "newly acquired owned equipment, provided that Underwriters are notified within 60 days of acquisition"; and (3) "nonscheduled equipment leased, rented or borrowed from others, where the Insured may be held liable." [76]

■ The Insured have not met their burden of proving that the claimed costs fall under any of the three coverages that the Contractors Equipment provision lists. Specifically, the Insured have failed to demonstrate that the damaged equipment was "scheduled equipment" pursuant to the Schedule on file with the Insurer.[77]

---

68. Policy 28.

69. *Id.* at 29.

70. Def.'s Mem. Supp. Summ. J. Ex. 25, Chomyszak Dep. 28:20–29:4, Oct. 15, 2007.

71. Policy 29.

72. Attles EUO 90:23–91:3.

73. 33 E. George Daher & Harvey Chopp, *Massachusetts Practice Landlord and Tenant* Law § 3:8 (3d ed. 2009) (citing *Cent. Mills Co. v. Hart,* 124 Mass. 123 (1878)).

74. Policy 29.

75. The Insured originally asserted this claim under the Real and Personal property provision. *See* Dec. 29 Submission 10.

76. Policy 6 (emphasis added).

77. *See* Def.'s Mem. Opp'n Pls.' Mot. Summ. J. Ex. 1, Contractors Equipment Schedule 1.

The Insured argue that the Schedule was not a part of the Policy because it was unattached, but the Insured do not cite any law for this proposition and ignore the explicit reference in the Policy to the "Schedule on file with Underwriters." [78] The Insured's promissory estoppel argument also fails. Even assuming "Dowling instructed Demers to clean and oil its contracting equipment," [79] such an instruction would not have constituted an unambiguous promise on behalf of the Insurer to provide coverage for the equipment.[80]

Accordingly, Defendant's Motion is ALLOWED and Plaintiffs' Motion is DENIED with respect to Plaintiffs' contractors' equipment claim.

### f. Supplemental Personal Property, Rigging Equipment, and Mossberg Personal Property

In their Motion, the Insured bring "Supplemental Personal Property Claims" and claims for "Rigging Equipment" and "Mossberg Personal Property" under the Real and Personal Property and Contractors Equipment provisions. This court has already held that the Insured have not met their burden of proving coverage under the Contractors Equipment provision.[81] As to the IRS invoice, this court has held that $88,735.34 is recoverable under the Extra Expense provision,[82] which creates additional room for the Insured to seek compensation under the Real and Personal Property sublimit. The Insured have produced reliable evidence in support of their claims for "Mossberg Realty Personal Property, Clean/Service," two "Player Pianos," one "Step–Down Transformer," one-hundred "Bundle[s] of Clothing," and one "Clean Room, Complete & Disassembled" totaling $430,150.[83] Though the Insurer and Insured disagree over the outer boundaries of these claims, it is not necessary for this court to arrive at a precise dollar amount. Any disagreement between the Insurer and Insured is insufficient to preclude a finding that the Insured have proven at least $88,735.34 in additional claims under the Real and Personal Property sublimit. The Insured are entitled, therefore, to $88,735.34.

Accordingly, with respect to Plaintiffs' personal property, rigging equipment, and Mossberg personal property claims, Defendant's Motion is ALLOWED IN PART and DENIED IN PART, and Plaintiffs' Motion is ALLOWED IN PART and DENIED IN PART.

### g. $2,500 Deductible

In their Motion, the Insured assert that the Insurer improperly reduced the Real and Personal Property sublimit by the $2,500 Policy deductible. The Policy states that the $2,500 deductible applies "per 'Occurrence,'" [84] and the Policy de-

**78.** Policy 6.

**79.** Pls.' Reply Mem. Supp. Pls.' Mot. Summ. J. 2.

**80.** Under Massachusetts law, "promissory estoppel permits recovery when (1) a promisor makes a promise which he should reasonably expect to induce reliance by the promissee; (2) the promise induces such reliance; and (3) injustice can be avoided only be enforcing the promise." *Day v. Staples, Inc.*, 573 F.Supp.2d 336, 348 (D.Mass.2008) (citing *Hinchey v. NYNEX Corp.*, 144 F.3d 134, 143 (1st Cir.1998)). A party seeking promissory estoppel must show that he *"reasonably* relied on the alleged promise to his detriment," *Coll v. PB Diagnostic Systems, Inc.*, 50 F.3d 1115, 1124 (1st Cir.1995) (quotation and citation omitted), and that the promise was "unambiguous," *Upton v. JWP Businessland*, 425 Mass. 756, 682 N.E.2d 1357, 1360 (1997).

**81.** *See supra* subsection III.B.2.e. (discussing the Insured's contractors' equipment claim).

**82.** *See supra* subsection III.B.2.c. (discussing the Insured's IRS invoice claim).

**83.** Dec. 29 Submission 10.

**84.** Policy 16.

fines "Occurrence" as "any one 'loss', disaster, casualty or series of losses, disasters, or casualties, arising out of one event."[85] This means that the deductible applies to the top of the Insured's aggregate claims rather than the top of the Real and Personal Property sublimit. Given that the Insurer has not opposed this portion of the Insured's Motion and it is reasonably apparent that the Insured's aggregate claims exceed $1,022,500 (the $1,020,000 Real and Personal Property sublimit plus the $2,500 deductible),[86] the Insured are entitled to recover the $2,500 deductible.

Accordingly, Defendant's Motion is DENIED and Plaintiffs' Motion is ALLOWED with respect to Plaintiffs' $2,500 deductible claim.

### h. *Statutory Interest*

In their Motion, the Insured seek statutory interest pursuant to chapter 175, sections 99 and 102 of the Massachusetts General Laws. Section 99 provides that

[i]n case of any loss or damage, the [insurance] company, within thirty days after the insured shall have submitted a [signed, sworn statement in proof of loss,] ... shall either pay the amount for which it shall be liable, which amount if not agreed upon shall be ascertained by award of referees as hereinafter provided, or replace the property with other of the same kind and goodness.[87]

Section 99 states further that the insurer "shall be liable for the payment of interest ... on the agreed figure commencing thirty days after the date an executed proof of

loss for such figure is received by the company."[88]

The Insurer argues that it rendered payment for the Building claim and the IRS invoice within thirty days of receiving the Insured's proof of loss for each claim, and otherwise complied with its statutory duties. Under Massachusetts law, "[a]n insurer is not required to pay a loss before its amount has been established by agreement or arbitration."[89] Given that the Insurer has timely reimbursed the Insured for all agreed-to amounts of loss, the Insurer has satisfied the requirements of section 99.

The Insured contend that both section 99 and section 102 apply in this case, and that a jury could find that the date of agreed-to loss was in May 2005. First, section 102 does not include a provision on statutory interest. The *Ben Elfman* court disagreed with the trial court's application of section 102 to provide interest to the insured and repeated the section 99 requirements that the insured "would not have been entitled to payment or the commencement of interest thirty days later" because "[t]here was no agreement as to the extent of that loss."[90] Second, the Insured's contention that a jury could find the date of agreed-to loss was in May 2005 is immaterial under section 102, which provides that the thirty-day clock does not begin until the insured submits a "signed, sworn statement in proof of loss" that is "established by agreement or arbitration."[91] The Insured have not demonstrated that the Insurer ever failed to pay

---

85. *Id.* at 14.

86. *See supra* subsection III.B.2.f. (discussing the Insured's personal property, rigging equipment, and Mossberg personal property claim).

87. Mass. Gen. Laws Ann. ch. 175, § 99 (West 2009).

88. *Id.*

89. *Ben Elfman & Sons, Inc. v. Home Indem. Co.*, 411 Mass. 13, 576 N.E.2d 670, 674 (1991).

90. *Id.* at 675.

91. *Id.* at 674.

the Insured within thirty days of the submission of an agreed-to, signed, sworn statement in proof of loss.

Accordingly, Defendant's Motion is AL-LOWED and Plaintiffs' Motion is DE-NIED with respect to Plaintiffs' statutory interest claim.

### i. Consequential Damages

■ There being a genuine issue of material fact as to whether the Insured suffered consequential damages as a result of any of the Insurer's Policy breaches and, if so, the amount of those damages, Defendant's Motion is DENIED and Plaintiffs' Motion is DENIED with respect to Plaintiffs' consequential damages claim.

### C. Count III: Violation of the Massachusetts Consumer Protection Law

■ Under chapter 93A, section 2 of the Massachusetts General Laws, "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are ... unlawful." [92] Evidence of unfair business practices under 93A includes "[u]nfair claim settlement practices." [93] To bring an unfair claim settlement practices action under section 11, there must have been a "commercial transaction" [94] between two parties "acting in a business context." [95] Here, the Insured's purchase of insurance constituted a commercial transaction be-tween the Insurer and the Insured,[96] and both Parties were clearly acting in a business context.[97]

■ The Insured argue that the Insurer engaged in unfair claim settlement practices by requesting documentation that was irrelevant or readily available, unnecessarily delaying payments, failing to investigate the Insured's claims, and blatantly misinterpreting the Policy. The Insurer responds that its claim settlement practices were fair because it considered all the relevant documentation in investigating the Insured's claims, received deficient and delinquent information from the Insured, and acted in good faith by timely paying the Insured the entirety of the Real and Personal Property sublimit. As the conflicting evidence demonstrates, there is a genuine issue of material fact as to whether the Insurer's claim settlement practices were "unfair."

Accordingly, Defendant's Motion is DE-NIED and Plaintiffs' Motion is DENIED with respect to Plaintiffs' consumer protection claim.[98]

### IV. Conclusion

For the reasons stated above, Defendant's *Motion for Summary Judgment* is ALLOWED IN PART and DENIED IN PART, and Plaintiffs' *Motion for Partial*

92. Ch. 93A, § 2.

93. *Id.* ch. 176D, § 3(9).

94. *Szalla v. Locke,* 421 Mass. 448, 657 N.E.2d 1267, 1269 (1995).

95. *Begelfer v. Najarian,* 381 Mass. 177, 409 N.E.2d 167, 176 (1980) (quotation and citations omitted).

96. *See Szalla,* 657 N.E.2d at 1270.

97. In addition, the Insured have satisfied the requirement that the "actions and transactions constituting the alleged unfair method of competition or the unfair or deceptive act or practice" have occurred "primarily and substantially within the commonwealth." Ch. 93A, § 11. Here, the Insured are Massachusetts companies, and the loss—the damage to the Building—occurred in Massachusetts.

98. In their Motion, the Insured reraise the discovery issue of documents that the Insurer withheld as work product. In its March 4, 2008 Order, this court considered "Defendant's position to be a valid assertion of privilege, with the exception of Document #91." Because Parties have not fully briefed the discovery issue, this court declines to revisit its ruling.

*Summary Judgment* is ALLOWED IN PART and DENIED IN PART. Plaintiffs are entitled to recover $30,132 for expenses related to the MIT cables, $42,335.58 for various repair expenses, $88,735.34 in real and personal property damage, and $2,500 for the deductible.

There are genuine issues of material fact as to whether: (1) any of the damaged switchgears were the switchgears listed in the Stern–Leach #11 document and therefore excluded from coverage; (2) the security guard service and security system were "necessary" extra expenses; (3) the loss of rental space and labor to relocate were "necessary" extra expenses; (4) the Insured suffered consequential damages as a result of any of the Insurer's Policy breaches and, if so, the amount of those damages; and (5) the Insurer's claim settlement practices were "unfair." AN ORDER HAS ISSUED.

### ORDER

For the reasons set forth in the accompanying Memorandum, this court hereby orders that:

1. Defendant's *Motion for Summary Judgment* [#33] is ALLOWED IN PART and DENIED IN PART:
 a. Defendant's Motion is ALLOWED with respect to Plaintiffs' (1) loss of rent, (2) contractors' equipment, and (3) statutory interest claims.
 b. Defendant's Motion is DENIED with respect to Plaintiffs' (1) MIT cables, (2) switchgears, (3) security guard service and security system, (4) various repair expenses, (5) lost rental space and labor to relocate, (6) $2,500 deductible, (7) consequential damages, and (8) consumer protection claims.
 c. With respect to Plaintiffs' IRS invoice claim, Defendant's Motion is DENIED as to the $88,735.34 in expenses related to protecting the Building from further water inundation and damages and ALLOWED in all 2 other respects.
 d. With respect to Plaintiffs' supplemental personal property, rigging equipment, and Mossberg personal property claim, Defendant's Motion is DENIED as to the $88,735.34 split from the IRS invoice and ALLOWED in all other respects.
2. Plaintiffs' *Motion for Partial Summary Judgment* [#38] is ALLOWED IN PART and DENIED IN PART:
 a. Plaintiffs' Motion is ALLOWED with respect to their (1) MIT cables, (2) various repair expenses, and (3) $2,500 deductible claims.
 b. Plaintiffs' Motion is DENIED with respect to their (1) switchgears, (2) security guard service and security system, (3) lost rental space and labor to relocate, (4) loss of rent, (5) contractors' equipment, (6) statutory interest, (7) consequential damages, and (8) consumer protection claims.
 c. With respect to their IRS invoice claim, Plaintiffs' Motion is ALLOWED as to the $88,735.34 in expenses related to protecting the Building from further water inundation and damages and DENIED in all other respects.
 d. With respect to their supplemental personal property, rigging equipment, and Mossberg personal property claim, Plaintiffs' Motion is ALLOWED as to the $88,735.34 split from the IRS invoice and DENIED in all other respects.
3. Plaintiffs are entitled to recover $30,132 for expenses related to the MIT cables, $42,335.58 for various repair expenses, $88,735.34 in real and personal property 3 damage, and $2,500 for the deductible.

4. Defendant's *Motion to Strike Portions of Christopher Attles' Affidavit and the Attendant Additional Material Facts* [# 50] is DENIED AS MOOT.

5. There are genuine issues of material fact as to whether: (1) any of the damaged switchgears were the switchgears listed in the Stern–Leach # 11 document and therefore excluded from coverage; (2) the security guard service and security system were "necessary" extra expenses; (3) the loss of rental space and labor to relocate were "necessary" extra expenses; (4) the Insured suffered consequential damages as a result of any of the Insurer's Policy breaches and, if so, the amount of those damages; and (5) the Insurer's claim settlement practices were "unfair."

IT IS SO ORDERED.